[Filed July 2, 1888.]

# STATE OF OREGON, Respondent, *v.* CHING LING, Appellant.

Evidence.—An error of a court in the trial of an action, where from its nature and effect it could not possibly have injured the party against whom it was committed, is not a sufficient ground for the reversal of a judgment obtained therein; but where the error consists in the admission of improper testimony, which was liable to influence the result in any degree, an appellate court cannot disregard it.

Criminal Law—Challenge of Juror.—Where in the trial of a criminal action the counsel for the State challenged a juror for cause, upon the ground that his name did not appear upon the assessment roll of the county for the preceding year, and the counsel for the defendant denied the challenge, and the court sustained it, *quære*, whether the challenge was properly sustained. *Held*, however, that it was immaterial whether the challenge was properly sustained or not; that if the holding was erroneous it could not have prejudiced the defendant, and was not, therefore, a sufficient ground for a reversal of the judgment of conviction.

Criminal Evidence.—Where upon the separate trial of one defendant, under an indictment charging him and four others with having purposely, and of deliberate and premeditated malice, killed L. Y., evidence of facts and circumstances occurring previously, from which it might be inferred that some of the defendants entertained malice toward L. Y., was offered by the prosecution and admitted by the court. *Held*, that the evidence was incompetent, as against the defendant on trial, where no showing whatever had been made connecting him in any way with such facts and circumstances, or that he was cognizant of them. *Held*, that an exception to the overruling by the court of an objection interposed by the defendant's counsel to the admission of the evidence was well taken; and that the ruling was such an error as to require a reversal of the judgment of conviction recovered in the trial. *Held*, that testimony offered on the part of the defendant as to what he said prior to his going to the place where the homicide was committed, in order to characterize his intention in going there, was not a part of the *res gestæ*, and was, therefore, inadmissible.

Reasonable Doubt Defined.—A reasonable doubt, as used in the law of evidence, defined to be a conscious uncertainty in the mind of the jury, after a fair consideration of all the proofs in the case respecting the guilt of the accused.

Appeal from a judgment of conviction of the Circuit Court for the county of Multnomah.

*W. W. Page*, and *Frank V. Drake*, for Appellant.

*H. E. McGinn*, and *N. D. Simon*, for Respondent.

Thayer, J.—The appellant, Chee Gong, Fong Long Dick, Yee Gong, and Chee Son were jointly indicted by the grand jury of the county of Multnomah, for the crime of murder in

the first degree. They were charged in the indictment with having, on the sixth day of November, 1887, at said county, murdered Lee Yick. They each pleaded not guilty to the indictment and demanded separate trials. The appellant was tried and found guilty of the crime charged, and upon which the judgment of conviction appealed from was entered against him. His counsel claim upon the appeal that several errors were committed at the trial prejudicial to their client, and that the conviction should be set aside and a new trial granted him.

It appears from the testimony upon the part of the State, that on the sixth day of November, 1887, in the Chinese Theater in Portland, Multnomah County, the said Lee Yick, a Chinaman, was set upon by the defendants, who were also Chinamen, and assassinated. The witnesses who testified to the fact were also Chinamen. They were Ah Kam, Boy Noy, Ah Yim, Ah How, Ah Fat, Lee Shung, and Lee Toy. Their testimony seems to be positive, that at the time and place mentioned, at or near the hour of midnight, during the performance of a play which had drawn a full house, the defendant Chee Gong, with a knife, the appellant with a hatchet, and the other three defendants with iron bars, murderously assaulted the deceased, and after a desperate struggle, Chee Gong sv ceeded in stabbing him in the head with the knife, and thereby inflicting upon him a mortal wound.

The appellant in order to refute this testimony called as witnesses, Ah Gong, Ah Kim, Ah Sam, Chee Jim, and Ah Joe, who severally testified that on the night of the 6th of November, 1887, they were at the Chinese Theater at the time of the affair, about a quarter to twelve, midnight, and that they had known Ching Ling, the appellant, for about two years; that on this night they sat near to him on the benches to the left of the main entrance into the theater from Second Street, opposite side of the building from where the row or killing took place, and that he did not and could not take part in the affair. That Ah Gong and Ah Kim went with Ching Ling to the theater about nine o'clock that night, and took seats to the left of the entrance, and they, and the remainder of said witnesses, testified that

Ching Ling did not leave the place until after the homicide occurred; and Ah Gong testified that the appellant went out of the theater down the stairs, through the crowd onto Second Street to Mah Lee, corner of Alder and Second streets, where he lived and had been rooming. There was also testimony in the case in behalf of the State, and of the appellant, tending to corroborate the evidence of their respective witnesses referred to.

The first ground of error relied upon by appellant's counsel is the ruling of the court upon a challenge to a juror interposed by the district attorney. It appears that while the jury was being impaneled one John Epperly, who had been duly summoned as a juror, stated, in answer to a question put to him by the district attorney, that his name did not appear on the assessment roll for the year 1886. The district attorney, therefore, challenged the juror for cause, which challenge being denied by the appellant's counsel was sustained by the court. This ruling the appellant's counsel insist was error.

It does not appear whether or not Epperly was upon the regular panel; the presumption is that he was not, as the County Court is required to take the jury list from the last preceding assessment roll of the county, and it is presumed to have done its duty in that particular. I doubt very much, however, whether the challenge was well taken. The juror's name not being upon the assessment roll, it seems to me is no ground for challenge. The Circuit Court appears to have viewed the subject differently, and I think it would be better if the rule were in accordance with its holding. But the statute prescribes in express terms the qualifications of jurors, and their names being upon the assessment roll is not included among them. The error, however, if it were one, could not possibly have injured the appellant, and is therefore no ground for reversing the judgment.

The next ground of error is the admission of testimony alleged to be improper. It appears that one Berger was called as a witness on the part of the State, and testified that he kept the Saddle Rock Restaurant, No. 220, First Street, Portland; that he knew Lee Yick in his lifetime; that Lee Yick worked for

witness with Chee Gong and his cousin; that he was acquainted with Chee Gong about three months and a half; that Chee Gong was in his employ—was his dish-washer. The witness was then asked what he knew about Chee Gong's having met with Lee Yick, and to state all about it; what was said and done. This question was objected to by the appellant's counsel as incompetent and immaterial, whereupon the district attorney modified it so as to confine the inquiry to Chee Gong's action, but the appellant's counsel still insisted upon their objection. The court overruled the objection, to which the appellant's counsel saved an exception.

The district attorney then asked the witness to state how Lee Yick came to meet Chee Gong, and what was done by him at that time. The appellant's counsel as preliminary to their objecting to the question asked the witness if Chee Gong was present, and upon his answering "that he could not say," objected to the testimony as incompetent and immaterial. The court overruled the objection, to which the appellant's counsel excepted. The witness then testified that Chee Gong did not do right and he discharged him; that Chee Gong came to work for witness in September, and worked only a few weeks; that five men left with him; that when he discharged these fellows "they were very angry; and when they came to get their pay they met Lee Yick, and Chee Gong talked very loud as though he was very angry; that witness did not think he owed them as much as they claimed; that Lee Yick worked for witness until he was killed; that five men came with him in place of the five men that left; that Lee Yick procured the men who took the place of Chee Gong and those who left; that Lee Yick entered witness' employment on the 3d of October last, and Chee Gong and the men with him left on that day; that Lee Yick went to work that morning; that witness could not say for certain whether he had the appellant in his employ when Chee Gong was there, but thought he was night cook; that he looked like the night cook that was there then.

The witness, upon his cross-examination, when asked what Chee Gong was angry about, said that he seemed to be angry

because witness discharged him; that he claimed a dollar more than witness paid him, and that rather than have a fuss, and to settle it, he paid him a dolllar. The object of this testimony, evidently, was to show that the appellant and the other China-men charged with the offense bore such malice towards the deceased as to prompt them to commit the homicide. There could have been no other purpose for introducing it. The testimony was not sufficient to have had any weight whatever as against white persons. But very few of them at most could be found credulous enough to believe that *their* race, in consequence of such an occurrence as happened to Chee Gong and his friends, in the affair of their discharge from employment at the restaurant, would have been induced to plan and execute a murder. As to Chinamen, however, it is different. Those among us have exhibited such a peculiarity of temperament, that a circumstance of that character would incite a strong suspicion against them.

It was a circumstance sufficient, in the opinion of a great majority of our people acquainted with the customs and dis-position of the lower class of the Chinese, to induce them, through a spirit of revenge, to conspire against the life of one of their fellows, and commit deeds of violence. The evidence as to whether the appellant assisted in the killing, as testified by witnesses on the part of the State, or as to whether he occupied the place in the theater the witnesses on his part testified that he did, and took no part whatever in the fray, directly conflict. Taken by itself, it would be very difficult to determine where the truth lay. Hence the testimony as to the discharge of Chee Gong and associates from the employment, as to Lee Yick and his friends superseding them in the employment, as to Chee Gong exhibiting temper on the occasion, and the possibility of the appellant being one of the five Chinamen discharged, and of his probable participation in the anger manifested by Chee Gong, was very important as a make-weight in favor of the evidence on the part of the State. Unless, therefore, the testimony referred to was competent, its admission was such an error as would necessarily affect the appellant injuriously. I do not think that the testimony admitted was competent as against the

appellant. It was not proved that he constituted one of the five Chinamen discharged, or was present when Chee Gong exhibited passion on account of his discharge.

There was some testimony introduced by the district attorney to the effect that the appellant had been in the employ of Berger, the keeper of the restaurant, but it was vague and uncertain. The evidence which the district attorney sought to establish was indirect in its character; it was an inference to be deduced from facts proved. The inference sought to be drawn in this case, and the jury allowed to make, was that the appellant entertained malice against Lee Yick, and hence had a motive in killing him. The testimony was introduced to establish facts which would authorize such an inference; and the Circuit Court virtually held, when it overruled the objection of appellant's counsel to its admission, that it was sufficient for that purpose, at least the jury must have so understood it. This clearly was error. The facts proved as against the appellant did not tend to show that he was one of the party who was discharged, or that he affiliated with them to any extent, or that he was present when Chee Gong and his friends left Berger's employment, or had ever heard of the matter. The evidence in regard to all of those particulars is entirely deficient. It merely shows, as before suggested, that the appellant may have been in Berger's employ, though the latter said that he could not say *that* for certain, though he was night cook there in September; that he looked like the night cook that was there then. Whether he left when Chee Gong did, or had gone before, or went afterwards, does not appear; nor does the evidence disclose facts upon which such a conjecture can be founded. No such inference, therefore, as that suggested could be drawn as against the appellant; and the testimony as against him should have been excluded. The judgment of conviction must be reversed and the cause remanded for a new trial.

This view renders it unnecessary to consider the other grounds of error assigned, except for the purpose of aiding the Circuit Court in the re-trial of the case. I do not think that the exception to the ruling upon the offer of the appellant's counsel to prove by Ah Gong what was said and done by the appellant at

Mah Lee about going to the theater on the night of the homi-
cide, and the occasion of his going there with the witness that
night, was well taken.   The offer did not disclose that what the
appellant said and did at the time referred to was a part of the
*res gestœ*, it was too remote.   (*State* v. *Glass*, 5 Or. 81.)   We
believe, however, as we intimated in *State* v. *Mah Jim*, 13 Or.
235, that it would be much better in the trial of Chinamen for
a capital offense, where the proof depends upon the Chinese
witnesses, to allow the accused a wide range with a view of
ascertaining the truth.

An attempt to apply strict technical rules in such cases is too
apt to result in a sacrifice of substance to form.   The law was
instituted to secure justice, and its design and purpose should
not be suffered to be defeated by a strict adherence to formal
rules in its administration.   In cases of homicide among these
Chinamen, it is almost impossible to ascertain who the guilty
parties are.   I am satisfied that they will not hesitate to conspire
and make those answerable for outrages who had no hand in
perpetrating them.   It behooves courts and juries in the trial of
these people for capital offenses, where the evidence of their guilt
depends mainly upon the testimony of their own kind, to be
prudent, vigilant, and discriminating; otherwise they are liable
to be made use of as a means to carry out the machinations of
the crafty and designing.

Tribunals of justice have an important responsibility to dis-
charge in such cases.   If they are stolid and persistently adhere
to formality, they subject themselves to imposition through
artifice and cunning, and permit the course of justice to be pre-
vented.   Juries should be loath to convict a Chinaman of murder
in the first degree upon Chinese testimony; not wholly on
account of a tender regard for the life of the accused, but also
from a respect and reverence for truth and justice.   If we were
disposed through a dislike of the race to consider the life of a
Chinaman as a trivial matter, still we would have no right to
immolate justice upon the altar of our prejudice.

The other grounds of error relate wholly to the instructions
given by the court to the jury.   I have read the instructions

carefully, and think the objections to them are more critical than sound. There are twenty-two of them in all beside those given in a modified form, which were requested by the appellant's counsel. The strongest objection to the instructions is that they cover too much ground, and many of them were inartificially drawn. Trial courts should instruct juries with reference to facts in the particular case before them.

It is highly proper in a criminal case to define the crime charged which the evidence tends to substantiate. In this case the testimony upon the part of the prosecution tended to prove, by the direct act of killing, the commission of the crime of murder, within one of the degrees specified in the statute. If the appellant was guilty of anything, it was of making, in connection with the four other Chinamen, a direct murderous assault upon Lee Yick and taking his life. It was unnecessary, therefore, to explain to the jury anything about murder under any other circumstances, or as to what would constitute justifiable or excusable homicide. There was no pretense that the act was done in the perpetration, or attempt to perpetrate "rape, arson, robbery, or burglary," or any other unlawful act; nor that it was justifiable or excusable. Nor were there any circumstances shown which would authorize the jury to find that it was done without design to effect the death of Lee Yick. Hence all that part of the instructions relating to those matters should have been omitted.

The exception to the fifteenth instruction has been urged with much force and apparent reason. That instruction is as follows: "You cannot find the defendant guilty of murder in the first degree, unless you are satisfied beyond a reasonable doubt that he purposely and of deliberate and premeditated malice, or in the commission, or attempt to commit rape, arson, robbery, or burglary, killed the deceased, or aided, assisted, or abetted in killing the deceased as charged in the indictment." The qualifying language in that instruction, "or aided, assisted, or abetted in killing the deceased as charged in the indictment," would, in my opinion, render it in the abstract erroneous. Aiding, assisting, or abetting the killing of a human being would not be

murder in the first degree, unless done purposely and of deliberate and premeditated malice.   But from other instructions given in the case, it is evident that the court intended and the jury understood that the "aiding, assisting, and abetting" in the killing, to constitute that degree of murder must have been done in that manner.   An exception to an instruction as to what constituted a reasonable doubt was also insisted upon by appellant's counsel as error.

Courts and law-writers seem to have had considerable difficulty in defining this phrase, consisting of two simple words used in the law of evidence.   They have explained it a great many times, but always have a sort of lurking impression that they have not rendered its meaning as satisfactory as they could have desired.   The definition of the expression given by the court in the instruction complained of is as follows: "A reasonable doubt is not every doubt; it is not a captious doubt; it is such a condition of the mind, resulting from the consideration of the evidence before you, as makes it impossible for you as reasonable men to arrive at a satisfactory conclusion.   It is not a consciousness that all conclusions arrived at may possibly be erroneous; but such a state of mind as deprives you of the ability to reach a conclusion that is satisfactory."   This definition substantially has been approved by acknowledged authority upon the subject.   It is, however, awkwardly expressed, and its style is too metaphysical to be understood by the average juror.

I think we have heretofore indicated a preference in favor of the one given by Chief Justice Shaw, in *Commonw.* v. *Webster*, 5 Cush. 295; 52 Am. Dec. 711, as follows: "It is that state of the case, which, after the entire comparison and consideration of all the evidence leaves the mind of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."   And it was thought by some learned reviewer of that case that the terms might perhaps be better described by saying "that all reasonable hesitation in the mind of the triers, respecting the truth of the hypothesis attempted to be sustained, must be removed by the proof."   The whole difficulty has arisen in attempting to

explain that the adjective "reasonable" does not mean, in the connection in which it is used, something different than it purports to. Trial courts usually begin their explanation of a "reasonable doubt" by telling the jury, as the learned judge did in that case, that it is not every doubt; it is not a captious doubt. Of course it could not be every doubt unless every doubt were reasonable; nor could it be a captious doubt, for such a doubt would be unreasonable.

In the trial of a party upon a criminal charge, the law does not require demonstration in order to justify a conviction; but it does require that degree of proof which establishes guilt to a moral certainty. It is not enough to show that the accused is *probably* guilty, but he must be *proved* guilty, not beyond a *possible* doubt, but beyond a *reasonable* doubt. I think it very questionable whether a trial court, in giving instructions to juries, should undertake to define a "reasonable doubt." The term "reasonable" imports its own signification, and an attempt to explain its meaning is liable to be misleading. There is no rule by which a juror can determine whether a doubt entertained by him is reasonable or not. He can only act upon his own judgment and understanding in the matter. The doubt may seem reasonable to him, and yet be utterly absurd. To tell the jury, as they were told in this case, that a reasonable doubt is such a state of mind as deprives them of the ability to reach a conclusion that is satisfactory would be no assistance to them. A prejudice or caprice might produce the same state of mind, and they not realize the distinction. In my opinion a reasonable doubt in such case is nothing more than a conscious uncertainty in the mind of the jury, after a fair consideration of all the proofs adduced, respecting the guilt of the accused.

There were other questions discussed at the hearing, and are referred to in the briefs of counsel. We have not mentioned them, for the reason that we have not deemed it necessary.