[Filed December 16, 1889.]

## STATE OF OREGON, RESPONDENT, *v.* CHARLES OLDS, APPELLANT.

CRIMINAL LAW—EVIDENCE—CROSS-EXAMINATION.—In a criminal case the district attorney has the right to cross-examine a witness for the defendant as to anything that would show his interest in the result of the trial, and anything he did in aid of the defendant about the trial, for the purpose of enabling the jury to properly weigh the evidence of such witness, and to intelligently pass upon his credibility.

EVIDENCE—MATERIALITY OF.—The first rule in the production of evidence is that the evidence offered must correspond with the allegations, and be confined to the point in issue. This rule excludes all evidence of collateral facts, or those which are incapable of affording any reasonable presumption, or inference, as to the principal fact, or matter, in dispute.

CASE IN JUDGMENT.—Where the defendant called a witness who gave evidence material to the defense, and then testified, on cross-examination, that he gave money himself to assist the defense, and procured money from others in Portland, Tacoma and Seattle, for the same purpose;

*Held,* it was not competent, either on the cross-examinaton of the same witness, or by making him the State's witness, to prove the names of the particular persons who were not witnesses in the case who contributed money, or that they were saloon-keepers or gamblers.

APPEAL from the circuit court for Multnomah county.

*Henry E. McGinn,* for State of Oregon.

*Richard Williams* and *H. Y. Thompson,* for Appellant.

STRAHAN, J.—The defendant was indicted by the grand jury of Multnomah county for the crime of murder in the first degree, and upon a trial before a jury of that county, he was found guilty as charged in the indictment and duly sentenced to suffer the penalty of death, from which judgment this appeal is taken.    Upon the argument on the appeal counsel for the prisoner argued with much force and ability two rulings of the trial court which were adverse to the appellant.    The first was the refusal of the court to continue the case for the term on account of the excited and inflamed state of the public mind in the county, alleged to have been caused by the comments of the Daily *Oregonian* and *Telegram* in reference to the killing charged in the indictment and the circumstances surrounding the event; and the other was the method pursued by the trial court in obtaining a jury for the trial of this particular case.    But in the view we have taken of some other questions presently to be noticed we have concluded to express no opinion on the two points above suggested.

1.    The main error relied upon by the appellant is the ruling of the trial court in the admission of evidence. One Thomas Williams, who was called as a witness on the part of the defense, gave evidence tending to prove that both he and the deceased Emil Weber were gambling men; that he had known deceased about five years; that about two hours before the killing he had a conversation with the deceased, in which, amongst other things, the deceased said, speaking of his eye, which had been hurt in a previous fight with the appellant, "I am pretty near ready for another battle, and it will not be a fist fight this

time." "He," meaning appellant, "can lick me in a fist
fight, and I will have no fist fight next time; I will just
kill the son of a bitch,—that is what I will do with him."
The witness also testified in substance that he knew the
general reputation of Weber in the community with refer-
ence to his being a peaceable and quiet or a quarrelsome
and dangerous man, and that such reputation was bad,
and that the defendant's reputation for peace and quietude
was good.    On his cross-examination this witness testified
in answer to questions by the district attorney, and with-
out objection, that he had collected money in Seattle,
Tacoma and Portland to assist in the defense; that he had
raised between eight and nine hundred dollars for that
purpose; that the witness had contributed about five hun-
dred dollars.    The district attorney then asked the witness
who were the parties here in Portland that had con-
tributed towards that fund, to which an objection was
made but overruled.    An exception was taken and the
witness said "Sliter."   The witness then testified, under
like objections and exceptions, that Sliter and McNamara
contributed $100; that John Russell kept a saloon on
Washington street and contributed to the fund; that "The
Mascot" also contributed; that Paul Fuhr also contributed
$100, but not in Portland; that Frenchy Grattan con-
tributed in the neighborhood of two hundred dollars, and
that his business was gambling.    None of these parties
inquired about by the district attorney were witnesses in
the case nor were they in any manner connected with the
trial.

The State had the right, on the cross-examination, to
ask this witness anything that would show his interest in
the result of the trial, and anything he did in aid of the
defendant about the trial, for the purpose of enabling the
jury to properly weigh his evidence, and to intelligently
pass upon his credibility.    This was done without objec-
tion.    Upon the argument here the district attorney
conceded that the examination by which the above facts
were elicited from the witness, Williams, was not cross-

examination, but that in asking these questions he made the witness his own, and that the facts were to be regarded as original evidence introduced on the part of the State, and this presents the real question to be determined by this court. Was it competent for the State to prove, as independent facts, that certain saloon-keepers and gamblers in the city of Portland contributed in making a defense in this case? This question may be answered by referring to one or two of the plainest and simplest elementary rules of the law of evidence: "And it is an established rule, which we state as the first rule governing in the production of evidence, that the evidence offered must correspond with the allegations, and be confined to the point in issue." 1 Greenleaf Ev., § 51. A few cases may be cited in which this rule has been indirectly or incidentally applied: *Campbell* v. *State*, 8 Tex. App. 84; *Watson* v. *The Commonwealth*, 95 Penn. St. 418; *Cesure* v. *State*, 1 Tex. App. 19; *Pinkard* v. *State*, 13 Tex. App. 468; *State* v. *Lapage*, 57 N. H. 245; *Farrar* v. *State*, 2 Ohio St. 54; *State* v. *Miller*, 47 Wis. 530; *Commonwealth* v. *Campbell*, 7 Allen, 541; *Hall* v. *State*, 51 Ala. 9; *Brock* v. *State*, 26 Ala. 104; *Rogers* v. *State*, 62 Ala. 170. And it is equally as well settled that this rule excludes all evidence of collateral facts, or those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute; and the reason is said to be that such evidence tends to draw away the minds of the jurors from the point in issue, and to excite prejudice and mislead them; and, moreover, the adverse party having had no notice of such a course of evidence, is not prepared to rebut it. 1 Greenleaf Ev., § 52. The evidence objected to did not in any manner relate to the killing of Emil Weber by the defendant, or have any connection whatever with that event; and it in no manner tended to connect the prisoner with the killing or accounted for his actions or motives.

To make the absurdity of such a rule as the State tries to apply in this case more apparent, let us suppose that a

considerable number of the best people of the city of Port-
land, or of the whole State, saw proper to raise a fund to
hire lawyers to assist in conducting this prosecution; could
those facts be shown by the State for the purpose of
throwing the moral force of their influence with the jury
against the prisoner? Or, let it be supposed that the same
class of people contributed a fund to assist the appellant
in his defense; could the fact be proven on his behalf for
the purpose of exciting sympathy in his behalf with the
jury? If such evidence as this would not be admissible,
on what principle can it be claimed that the fact that
saloon-keepers and gamblers contributed money to assist
the defense may be proven by the State against the pris-
oner? For what purpose was such evidence offered?
Manifestly for the purpose of arousing a prejudice in the
minds of the jury against the prisoner, and of exciting a
feeling of hostility against him, growing out of the fact
that lawless and immoral people were actively interesting
themselves in his defense. Of course we cannot say that
such evidence did have that effect upon the minds of the
jurors, but such was its tendency, and it is sufficient for
this case that it might have had that effect. When illegal
evidence is allowed to go to the jury, and particularly in
a criminal case, and more especially where life is involved,
we will not speculate upon its possible consequences.
Such an error, presumptively, injures the party against
whom such evidence is admitted, and ordinarily entitles
such party to a new trial.

2. The court did not err in refusing to charge that the
brass weight offered in evidence by the defendant was a
dangerous weapon. That depended, I think, on Weber's
ability to use it in such a manner as to cause death, or
great bodily harm. If he was capable of so using it, and
was armed with it at the time of the killing, then the jury
would have had the right to have found that he was armed
with a dangerous weapon, but this was a question for the
jury exclusively. It was not such a weapon as the court

could declare to be a dangerous weapon as a matter of law. *State* v. *Godfrey*, 17 Or. 300.

It follows that the judgment must be reversed, and the cause remanded to the court below for a new trial.

LORD, J., dissenting.—As I am unable to agree with my associates in the judgment reached for the reasons stated in the opinion, the importance of the question involved to the proper administration of justice, and to the community, seems to require of me a statement of the grounds of my dissent. The record discloses that the gamblers of the city of Portland were divided into two factions, one headed by the defendant Olds, and the other by Emil Weber, between whom there existed a fierce feud, which finally culminated in the death of Weber at the hands of the defendant Olds. The cause of the feud seems to have originated in the alleged fact that the police authorities had interfered with or closed a gambling game run by Weber, and as he thought the police were conniving at the other parties' game, and permitted it to be run unmolested, he interfered himself and brought their game to the attention of the authorities A witness for the defendant Olds, who was a saloon-keeper, according to the direct examination, among other things said in his cross-examination that "all the trouble of the gamblers grew out of the fact that Weber insisted that if he couldn't gamble on the first floor, these other parties should not be allowed to gamble on the second floor, and that Weber became a very bad man because he wouldn't allow others to gamble when he couldn't gamble." During the trial numerous witnesses were called by the State and the defendant, and especially by the latter, whose testimony discloses that they were gamblers and saloon-keepers, and his friends and companions. There is no effort of his counsel to disguise these facts. They stand confessed throughout all this record, and they come to the court and jury inhering in the case as a part and parcel of it. In the nature of things, a feud between such parties, resulting in the death of one of them

and the trial of his slayer, would necessarily involve "his kind of people," as the defendant's (Olds') counsel puts it, sometimes, in the prosecution and defense.    When such is the nature of the case, inevitably such will be the character of many of the witnesses.

It appears by the record that in the course of the trial the defendant Olds called as a witness one Williams, who, in his direct examination, testified that he was a gambling man; knew Weber and that gambling was his business; related the particulars of conversation with Weber, and was then asked: "Did you have a general acquaintance here in this city with the class of people that Weber associated with—his class of people?"    To which the witness answered "Yes."    He was then asked if he knew the general reputation of Weber in the community with reference to his being a peaceable and quiet man, or a dangerous man—a quarrelsome and dangerous man; to which the witness replied that he did, and that such reputation was bad.    He was then asked similar questions as to the defendant Olds, and his replies in effect were that his general reputation as a peaceable and quiet man was good.    *On cross-examination*, he testified that he had raised money to assist in the defense of Olds in Portland, Tacoma and Seattle, and against objection, from whom collected and their business, which was gambling and the saloon.    From this statement of the record, it will be seen that the cross-examination related to recent transactions bearing upon the character of the witness, and that its purpose was to show the extent of his zeal and activity for the defense, to enable the jury to make a proper estimate of his testimony.    These facts were not relevant, but irrelevant and collateral to the main issue, and were brought out on cross-examination of the witness to enable the jury to appreciate his fairness and reliability, and were such as it is not competent to prove them in any other way.    "It is difficult," say the court in *Moore* v. *State*, 20 Ohio St. 460, "to lay down any precise rule fixing the limits to which a witness may be cross-examined on matters not relevant to

the issue.    This must in a great measure rest in the sound
discretion of the court trying the cause.    Such questions
may well be allowed when there is reason to believe it will
tend to the ends of justice; but they ought to be excluded
when the disparaging course of the examination seems
unjust to the witness and uncalled for by the circum-
stances of the case." Some of the courts, notably in
*Muller* v. *St. Louis Hospt. Assoc.*, 73 Mo. 243, the rule is laid
down, without qualification, that a witness may be com-
pelled to answer any questions which tend to test his
credibility, or to shake his credit by injuring his character,
however irrelevant to the facts in issue or however dis-
graceful the answer may be to himself, except where the
answer would expose him to a criminal charge.

On the other hand, in delivering the opinion of the court
in *Trombley* v. *Watson*, Clark, J., said: "How far justice
requires a tribunal to go from the issue for the trial of col-
lateral questions, what evidence may be excluded for its
remoteness of time or place, and what evidence is other-
wise too trivial to justify a prolongation of the trial, are
questions of fact to be determined at the trial." The
expressions of judicial opinion upon the subject are
numerous, and a few of them will be cited to illustrate
the extent and application of the principle: "It has
always been found," said Campbell, J., "necessary to
allow the witness to be cross-examined, not only upon the
facts involved in the issue, but also upon such collateral
matters as may enable the jury to appreciate their fair-
ness and reliability. To this end a large latitude has been
given, where circumstances seem to justify it, in allowing
a full inquiry into the history of witnesses, and into many
other things tending to illustrate their true character.
This may be useful in enabling the court or jury to com-
prehend just what sort of person they are called upon to
believe, and such a knowledge is often very desirable.
* * * The rules of law do not allow specific acts of
misconduct, or specific facts of a disgraceful character, to
be proved against a witness by others. * * * Unless

the remedy is found in cross-examination, it is practically of no account." Peckham, J., said in *Le Beau* v. *People*, 34 N. Y. 233: "I wish to say that in my opinion, as a general rule, evidence on cross-examination tending to impeach the credibility of a witness should be rejected with very great caution; its exclusion can rarely be proper." And in a later case Grover, J., said: "It is held, for the purpose of discrediting his testimony, the witness may be asked, upon cross-examination, as to *specific acts*. This shows that upon a cross-examination of a witness, with a view of testing his credibility, inquiries are proper as to facts not competent to be proved in any other way." *Real* v. *People*, 42 N. Y. 270.

Without further reference, it may be said that the latitude of such cross-examination upon collateral matters for the purpose of impairing the credit of a witness, and enabling the jury to understand what sort of person they are called upon to believe, rests in the discretion of the trial court, but the opinion is indicated that they should fix the limits of such cross-examinations in such cases with great hesitation. My own opinion has been that the range of such cross-examinations, and the extent to which such questions should be allowed, depend upon the appearance and conduct of the witness, and all the circumstances of the case, and necessarily must be regulated by a sound discretion. *State* v. *Bacon*, 13 Or. 156. The view is expressed by Mr. Thompson in his excellent work on trials: "That it is within the discretion of the presiding judge to determine whether, in view of the evidence which has been introduced, and of the nature of the testimony given by the witness-in-chief, it is fit and proper that questions of the kind should be overruled, or to what extent such a cross-examination should be allowed." § 464. It necessarily results that the ruling of the trial court in the exercise of the discretion with which it is invested is not subject to review, except in cases of manifest injustice or abuse. I admit there has always seemed to me a good deal of inconsistency in the use and application of these

terms, but the authorities are well agreed that where the discretion has been abused, and injustice the plain consequence, that the appellate court will review the decision of the trial court. The extent, then, to which a cross-examination relating to collateral matters may be carried, being within the discretion, or sound discretion, of the trial court, we are to inquire whether, upon the facts as stated, it has abused that discretion to the manifest injustice to the defendant Olds. This abuse is supposed to consist in the fact that the trial court permitted, on the cross-examination of the witness Williams, evidence that certain saloon-keepers and gamblers contributed to the defense of the defendant Olds; although I confess I do not exactly comprehend, from the opinion of the majority, their application of the law to the facts. At any rate, in the latitude of cross-examination for the purpose of exhibiting his activity, bias, interest or hostility, and to enable the jury to properly estimate his testimony, it is incontestable that inquiries as to what the witness gave, or others contributed, for the defense was admissible. Inquiries of this character and to this extent could be brought out of him on cross-examination, and as we have shown, they are not competent to be proved in any other way. But the contention is, that they should have there stopped; that when the further evidence was developed that the other persons contributing were immoral men— gamblers and saloon men—that such testimony operated to prejudice and injure the defendant Olds in the estimation of the jury.

The witness under examination out of whom these facts were elicited testified in his direct examination that he was a gambling man, and on his cross-examination that he had contributed money for the defense of Olds, and collected money from others for that purpose, and to this extent the testimony is admitted to be legitimate cross-examination, so that we have the fact, that money was contributed by the witness, before the jury, and that he was a gambling man brought out or proved by the defendant's witness.

XVIII. Or.—29.

·If such matter operates to affect "the standing of the defendant" in the estimation of the jury, as claimed, the harm was already done, and the subsequent evidence elicited was at most only cumulative of what had been regularly and legitimately proven. The truth is, the fact of contributing to the defense of a man, especially when on trial for his life, is not in itself an immoral act. It has been often done, and by all classes of men, and finds its source in the instincts of our common humanity to relieve those to whom we are attached. Indeed, I think it is not an unusual thing for the friends of the accused, when on trial for his life, if his means are limited, to contribute money to employ attorneys to aid him in his defense. The law entitles him to a fair trial, and the duty of an attorney is to defend him with its shield, and secure that result. If the act of contributing is not in itself wrongful or immoral, does the fact that a gambler contributes to aid his friends, when in such an extremity, alter the case and make it an offense? Will not the generosity of such an act be more likely to excite some sense of respect or admiration in a jury than operate to create a prejudice, in consequence of the giver, against the defendant? Do not such acts rather indicate that such men, although plying a vocation in violation of law, still retain some of the better instincts of humanity, and that their conduct, like other men in similar cases, is sometimes characterized by generous impulses, and devoted attachment of friends in the day of distress and disaster? To say, in such cases, on cross-examination upon collateral matters of this kind, that had not the remotest tendency to prove any element of the crime charged, and that was developed only to show the extent of the activity and interest of the witness, that it operated to affect the standing of the defendant, Olds, in the estimation of the jury, and to excite an hostility against him, is, to my mind, unreasonable and absurd. The average juryman has been the butt of much ridicule, but this is an insult to his intelligence.

When, however, we consider by the admitted facts, disclosed upon the face of the record, that the defendant

Olds was a gambler; that his associates and friends were gamblers; that his leading witnesses were gamblers; that the witness Williams, who contributed largely and generously, was a gambling man; that the controversy and death of Weber arose out of a feud between gamblers, and that the jury knew all these facts, how is it possible that the defendant could be injured in the eyes of the jury, and a feeling of prejudice excited against him, because in a collateral matter it was developed that one Gratton, or some other, was a gambler, on the cross-examination of a witness for the defendant, who was a gambling man? Can we suppose that the effect of such association of names or vocations affected the standing of the defendant Olds, surprised the jury, and created a feeling of hostility against him? Is it rational? Does not the record made by himself repudiate the inference? It seems to me the bare statement of the facts carries its refutation. And when, in addition to all of this, we further consider that this was collateral evidence, developed on cross-examination, and that its object was only to show the extent of the witness' activity and interest, and that the presiding judge, in whom the law has vested a discretion, on the reasonable assumption that, the trial being immediately under his eye, he sees the witnesses, notes their conduct, and knows all the surrounding circumstances, is in a position to understand the extent to which such inquiries should be prosecuted, and when to allow or reject them, as to him the ends of justice may seem to require, it seems to me to be safer, and wiser, and more consistent with established principles, to refuse to review his rulings in such cases, unless in the exercise of his discretion there has been abuse or manifest injustice. The opinion of my associates seems to treat this collateral evidence as independent facts sought to be established in a direct way, and ask, was it competent for the State to introduce such testimony? This is dealing with it as if it was matter sought to be proved as relevant to the issue, and which in the refusal of the court to exclude it created error in law, and cites 1 Greenleaf Ev., § 51. The right

to put in evidence any circumstance which tends to make the facts in issue more or less probable, no one disputes. That is elementary law.    And as Cowan, J., said in *People v. Wiley*, 3 Hill, 194, so say I: "Had the case before us been one of improperly admitting evidence which bore in the least on the general question of guilt or innocence, no doubt a new trial should be granted." In all such cases, the single question presented to the court is one of relevancy or pertinency, and not of force or value as testimony. See, also, *State* v. *O'Neil*, 13 Or. 187.    The case here is not of matter relevant to the issue or merits, but of collateral or irrelevant matter to affect the force or value of a witness' testimony.    The reason, then, why such matter is incompetent, as asked by my associates, is plain.    The rules of law do not allow specific facts to affect the credibility of a witness, to be proven against a witness by others, and as Campbell, J., said, "unless the remedy is found in cross-examination it is practically of no account;" or as Grover, J., said: "This shows that upon a cross-examination inquiries are proper as to facts not competent to be proved in any other way."    The rules which apply to relevant inquiries can have no pertinency to collateral matter not intended to affect the merits.

Again, in the opinion, in order to make its views more clear and the absurdity of allowing such evidence more apparent, a case is supposed of the State trying to prove in a direct way that a considerable number of its good citizens had contributed money for the purpose of throwing their force with the jury against the prisoner, or *vice versa*, to excite sympathy for the defendant, and it is asked, could such facts be proven.    In the first place, the question assumes that such evidence is for the purpose of exerting this or that influence upon the jury, when the only object of the kind of evidence under consideration is to affect the force or value of testimony, and has nothing to do with the merits.    The inquiry is to what extent, within the proper discretion of the court, a witness on cross-examination may be inquired of upon collateral mat-

ters for the purpose of enabling the jury to properly esti-
mate the value of his testimony, and whether there has
been an abuse of such discretion upon the facts as disclosed
by this record. Neither the State nor the defendant can
make direct proof of this kind, and the case supposed is
not susceptible of legal demonstration in that way.

But let us try the illustrations in the domain of the law
where such questions are permissible, and as occurred in
this case, and see the result of the answers.

Suppose a number of good citizens should contribute to
aid the prosecution, and on cross-examination of one of
them, by counsel for the defendant, he should admit that
fact, and also name the others who had likewise contrib-
uted, and upon conviction does any one suppose the de-
fendant would have any standing upon appeal? His counsel
elicited the answers, and they would be conclusive upon
him, to say nothing of other objections; or *vice versa*, the
good brethren had contributed to aid the defense, and on
cross-examination the State's attorney developed like facts
from a witness for the defendant, does any one suppose,
upon conviction and appeal, he could plead that he was
injured and prejudiced by the revelation. The difficulty
lies in treating the question under consideration as matter
tending to touch guilt or innocence, and not as collateral
matter to be regulated by the proper discretion of the
court. Our difference, then, is radical and not susceptible
of compromise.

To my mind, the extent to which collateral evidence may
be received or rejected is addressed to the proper discre-
tion of the trial court, and in view of its efficiency to
test fairness and reliability, and to enable the jury to
distinguish the honest man from the rogue on the
witness stand, the trend of judicial thought has been to
extend rather than limit such discretion, and not to regard
it as subject to review except in cases of manifest injustice
or abuse. As a matter of fact, it was as natural and to be
expected that the defendant's friends, though gamblers,
should contribute to aid him, when on trial for his life, as

other men have done when some one of their friends have been in a like crisis; nor will the common sense of men, whether in the jury box or out of it, attach any more importance to the one than the other, or be guilty of the injustice of drawing different inferences, because of the giver, or any inferences or detriment or prejudice or hostility to the defendant. The purpose of such testimony, and the sense and the duty of the jury, combine to forbid it. To these considerations add and apply the facts as disclosed by this record, and for this court then to review and reverse this case, because the prosecution was allowed to go into this collateral matter, which in no possible way could affect the merits, will make a precedent which, if adhered to, must seriously impair the power of trial courts to administer justice and to enforce the just penalties of violated law. It is not so much the present case, but the future consequences, I would avoid.

For these reasons, much as I regret to differ with my brethren, I am compelled to dissent.