Argued March 3, decided April 5, rehearing denied December 31, 1910.

## STATE v. LEM WOON.*

[107 Pac. 974: 112 Pac. 427.]

CRIMINAL LAW—CONDUCT OF COUNSEL—HARMLESS ERROR.

1. Where, in a prosecution for murder occurring in a building in which a Chinese society had its headquarters, defendant, a Chinaman, on cross-examination and on direct examination referred to a Tong society and trouble therein which resulted in factions, and the dying declaration of the Chinaman murdered also referred to the factions, a question of the State's attorney to defendant's witness, "Isn't it a fact that that is a place where you keep a lot of knives and pistols and guns to kill people with?" is not reversible error, though on objection sustained,

*This case has been appealed and is now pending in the United States Supreme Court.—REPORTER.

the attorney asked in different terms the same question twice more, and it appeared that there was a box containing the weapons on a table in the presence of the jury, but which was excluded in the absence of the jury.

CRIMINAL LAW—CONDUCT OF COUNSEL—HARMLESS ERROR.

2. An objectionable question to a witness in a murder prosecution will not be reversible error, which, on objection, was withdrawn, and no ruling asked or exception taken.

WITNESSES—SCOPE OF CROSS-EXAMINATION—INTEREST.

3. In a prosecution for the murder, defendant's evidence tended to show that the trouble arose, not from a personal difficulty, but because of two factions of a Chinese Tong society, and a feud in consequence thereof. Defendant and another were arrested in their room with the door locked, and refused to admit the officers, and, when they forced the door, they found a third party with them, and a loaded revolver was discovered on the floor. On cross-examination of the third party, State's counsel asked: "Why didn't you open the door when the officers knocked?" *Held*, that the question was proper cross-examination, as tending to show the interest of the witness.

CRIMINAL LAW—HARMLESS ERROR—REMARKS OF COUNSEL.

4. Objectionable remarks of counsel for State in a criminal prosecution, induced by counsel for defendant, objecting to a proper question on cross-examination, are not reversible error where stricken on objection.

WITNESSES—SCOPE OF CROSS-EXAMINATION—CREDIBILITY.

5. In such case, cross-examination of the witness as to his conduct from the time he ate supper until his arrest was proper cross-examination, under Section 716, B. & C. Comp., allowing the court to permit inquiry into a collateral fact, when directly connected with the question in dispute; since it tended to show his interest, and may have had a bearing on his credibility.

CRIMINAL LAW—ADMISSION OF EVIDENCE—DEMONSTRATIVE EVIDENCE.

6. In such case the pistol found on the floor was properly admitted in evidence, though it was in no way connected with the shooting itself.

WITNESSES—CROSS-EXAMINATION—CROSS EXAMINATION OF DEFENDANT.

7. Under Section 1400, B. & C. Comp., making defendant in a criminal prosecution a competent witness in his own behalf, and providing that, when a defendant offers himself as a witness, he may be cross-examined as to all facts to which he has testified, tending to his conviction or acquittal, a defendant in a prosecution for murder testifying in his own behalf as to alibi and as to what took place at the hospital to which he was taken for identification by the party shot, may be properly cross-examined as to whether one whom he had named as eating supper with him at the time of the murder had gone out of the room during the time referred to, and as to defendant's acquaintance with, and his identification of, the parties who were at the hospital, as to whose statements he had testified on direct examination, and also where he had testified on cross-examination that his name was other than the one under which he was prosecuted as to his statements concerning his name made on arraignment, etc.

HOMICIDE—EVIDENCE AS TO NAME OF ACCUSED—QUESTION FOR THE JURY.

8. Where there is a conflict in the evidence as to the name of the accused and when the defendant was identified by several witnesses, independent of the name, as well as by the dying declaration of the deceased, it was a question for the jury.

CRIMINAL LAW—INTRODUCTION OF WITNESSES—HARMLESS ERROR.

9. A witness in a murder case testified that he had called the officers and pointed out the defendant, and that another Chinaman told him that defendant had done the shooting. Counsel for defendant remarked that the men who incited the arrest seemed to have disappeared, whereupon the State's attorney said that the person named by the witness would be produced if wanted, to which defendant's counsel answered, "Then we shall find out all about this." Held that, though it was not good practice for the State's attorney to produce such witness and place him on the stand without examining him, saying that he believed all his testimony was hearsay, still there was no error, where no ruling was made by the court or exception taken.

CRIMINAL LAW — APPEAL — NECESSITY OF OBJECTIONS — PARTY PROSECUTING.

10. On appeal in a prosecution for murder, the court cannot notice an objection, then first made, that the prosecution was conducted by an attorney hired by the friends of deceased to whom the State's attorney turned over the prosecution.

HOMICIDE—EVIDENCE—CHARACTERISTIC OF RACE—CHINESE.

11. In a prosecution for murder, all the parties being Chinamen, in which there was evidence tending to show that the murder was the result of a feud in a Tong society, evidence that it was a characteristic of the Chinese to be revengeful, etc., as bearing on the bona fides of the identification of defendant, is inadmissible in view of Sections 695, 722, B. & C. Comp., providing that all competent persons may be witnesses, and that a witness is presumed to speak the truth, since it could not be applied to the individual.

CRIMINAL LAW—INSTRUCTIONS—ASSUMPTION AS TO FACTS.

12. An instruction which leaves the fact of flight of defendant to the jury, and instructs as to the effect of flight, is not an invasion of the province of the jury.

HOMICIDE—EVIDENCE—RELEVANCY.

13. Defendant was present at a shooting in company with G., when they with another Chinaman were engaged in a felonious assault with firearms on deceased. Defendant and G. fled together to the same building where they were arrested, and a pistol which apparently had been recently discharged and reloaded was discovered in the same closet where G. had been concealed under circumstances indicating that it was one of the pistols used by the conspirators in perpetrating the murder. Held, that such pistol was admissible not only as an incident of the arrest, but also as one of the circumstances showing a criminal conspiracy to murder deceased.

CRIMINAL LAW—CONSPIRACY—EVIDENCE.

14. Where it was claimed that defendant and two others were involved in a conspiracy to murder deceased, and a pistol was found in a closet

where one of the alleged conspirators was concealed, and where he was found when he and defendant were arrested, the admission of such pistol in evidence against defendant was not objectionable as evidence of acts and declarations of a conspirator after the termination of the conspiracy.

From Multnomah:   EARL C. BRONAUGH, Judge.

Statement by MR. JUSTICE EAKIN.

On April 1, 1908, defendant, Lem Woon, jointly with Yee Gueng, was charged by information with the crime of murder by killing Lee Tai Hoy on March 7, 1908, and upon a separate trial was found guilty of murder in the first degree, and appeals from a judgment thereon. The homicide was committed in a building at the corner of Fourth and Pine streets, in Portland, Oregon.   This defendant, Yee Gueng, and Jo Ah Bong, lived in two rooms on the third floor of a building at the corner of Second and Oak streets, on the east side of Oak, being one block south and two blocks east of the place of the homicide.   Defendant denied that he did the killing, and attempted to prove alibi.   He also contends that his name is Lum Suey, and not Lem Woon.          AFFIRMED.

For appellant there was a brief with oral arguments by *Mr. John F. Logan, Mr. Frank F. Freeman, Mr. Ralph E. Moody* and *Mr. Henry E. McGinn.*

For the State there was a brief over the names of *Mr. George J. Cameron,* District Attorney, *Mr. Joseph J. Fitzgerald,* deputy district attorney, and *Mr. Dan J. Malarkey,* with oral arguments by *Mr. Fitzgerald* and *Mr. Malarkey.*

MR. JUSTICE EAKIN delivered the opinion of the court.

Many of the assignments of error arise out of the fact that there is evidence tending to show that decedent, the two defendants, and most of the witnesses are Chinese, and are members of a Chinese society known as the "Bow On Tong"; that before the killing there was trouble in the Tong, which had divided it into two factions; and

that decedent was blamed for this trouble. Most of the Chinese witnesses for the State and the decedent belonged to what is referred to as the new faction, and most of those for the defense belonged to the old faction, and there was evidence tending to show that the killing was the result of the trouble between the factions. The trial was conducted principally by Dan J. Malarkey, who appeared with the district attorney for the State.

1. The first assignment of error relates to the conduct of Mr. Malarkey in the cross-examination of Chin Lum, a witness for defendant, who belonged to the old faction of the Tong, lived in the same rooms with defendant, and testified for defendant upon his defense of an alibi. After some cross-examination as to what took place at those rooms, Mr. Malarkey asked: "Isn't it a fact that is a place where you keep a lot of knives and pistols and guns to kill people with?" This was objected to, and the objection sustained. The question was repeated in a different form, and an objection again sustained, and a third time it was asked in another form, and objected to. The objection was at first overruled, and the witness answered:

"That place belong Bow On Tong, formerly Bow On Tong headquarters. Good many members come there to stay, and leave their things there. Don't know who belonged, because former time Bow On Tong been there."

It appears that a box containing the weapons referred to in the question were on the clerk's desk, and were about to be presented by counsel, when the court adjourned until morning and reserved final decision for further consideration. On reconvening court, the judge announced that he was not clear as to the admissibility of this evidence, and that the defendant should have the benefit of the doubt, and excluded the evidence. Thereupon, at the request of Mr. Malarkey, the jury retired, and in their absence there was further controversy in

relation to the question, and the weapons were offered in evidence, but not in the presence of the jury, when the court said:

"The introduction of the weapons under such circumstances might tend to prejudice the case of this defendant in the minds of the jury. Call the jury."

It is not necessary for us to determine the relevancy of the matter sought to be adduced by the question and offer, as the objections were sustained.

2. But the inquiry is whether asking the question, the presence of the box of weapons, and the statement were prejudicial and reversible error, without other ruling by the court or exception by defendant. The first reference to the trouble in the Bow On Tong was by the defense in the cross-examination of the State's witnesses Lee Shu and Gow Ying Yuen. It was also mentioned by decedent in his dying declaration as testified to by Lee Hueng and R. W. Wilbur, and also by defendant in his direct examination, and this question was asked evidently on the theory that the trouble resulting in the shooting was a Tong fight, and we see nothing in the facts or conduct of counsel to indicate that the question was asked in bad faith or from an improper motive. The mere asking of the question was not reversible error. In this connection may be considered assignment of error No. 6, relating to the conduct of Mr. Malarkey in asking defendant's witness Sam Ah Pye, "You and Won Jake Num have fixed up a good many Chinese jobs, haven't you?" which, upon objection, was withdrawn, and no ruling was asked or exception taken, and therefore no error was committed, although the asking of such a question should not be countenanced.

3. The second assignment of error relates to the scope of the cross-examination of Jo Bong, a witness for defendant, and the statements of Mr. Malarkey in rela-

tion thereto. His direct examination related only to what took place in his hearing at the hospital. Defendant's counsel had previously brought out in cross-examination of the State's witnesses and by defendant himself the facts disclosed as to the Bow On Tong, the division in it, and that the Chinese witnesses belonged to one faction or the other. It was evidently the purpose of the defendant to impress upon the jury that the killing of Lee Tai Hoy was the result of a feud in the Tong, one faction against the other, rather than a personal difficulty between the slayer and Lee Tai Hoy. This purpose is also disclosed by the effort of defendant to introduce the evidence of Mr. Lord and Sam Ah Pye as to the custom of the Chinese to seek revenge in such cases against any one in the opposing faction. Jo Ah Bong, as had had already been shown by the State's evidence, was present when defendant and Yee Gueng were arrested in their rooms at the corner of Second and Oak streets, having the door to the rooms locked and barred, and refused to admit the officers, and, when they forced the door, they found Jo Bong and defendant Yee Gueng in the toilet and this defendant in the other room. And, after arresting Jo Bong and Yee Gueng, they discovered on the floor of the toilet a 41 Colt's revolver loaded. Upon the cross-examination of Jo Bong, Mr. Malarkey asked: "Why didn't you open the door when the officers knocked?"

4. Counsel for defendant objected to this question on the ground that it was incompetent and not cross-examination, whereupon Malarkey remarked:

"Are you objecting to having this man who was down there tell what happened there? Can't I show that you tried to seal this man's lips who was there; that he was standing on guard at the door with a gun, preventing the police getting them; * * and I have a right to show the interest of this witness in this case and show that this

witness, whom you put upon the witness stand, and whom you fail to ask about what occurred at the time and place where he was present. I have a right to develop upon his cross-examination his interest in this defendant," etc.

Defendant's counsel moved that "these remarks be stricken out with reference to murderers and everything else in this case, and the remarks about the man standing on guard at the door with a pistol." The reference to "murderers and standing guard with a loaded revolver" was stricken out. The question objected to was proper cross-examination, as tending to show the interest of the witness, and the aid he was rendering defendant and the objectionable parts of Malarkey's remarks were stricken out. We find no prejudicial error in this assignment.

5. Thereafter the witness was cross-examined at length as to his conduct from the time he ate supper until the time of the arrest, about 8 o'clock, all of which was objected to as not cross-examination, and exceptions were saved. This examination tended to show his interest and may have had a bearing upon his credibility, and was within the State's privilege of cross-examination. It is said in *State* v. *Mah Jim,* 13 Or. 235 (10 Pac. 306), that "in a criminal case any question which tends to show a feeling or bias of the witness against the accused is competent." In *State* v. *Olds,* 18 Or. 440, 442 (22 Pac. 940, 941), it is said:

"The State had the right, on cross-examination, to ask the witness anything that would show his interest in the result of the trial, and anything he did in aid of the defendant about the trial for the purpose of enabling the jury to properly weigh his evidence, and to intelligently pass upon his credibility."

By Section 695, B. & C. Comp., the presumption that a witness speaks the truth may be overcome by evidence affecting his motives. Section 716, B. & C. Comp., provides that it is "within the discretion of the court to per-

mit inquiry into a collateral fact, when such fact is directly connected with the question in dispute, and is essential to its proper determination, or when it affects the credibility of a witness."

6. At the close of the testimony of Tichenor, the pistol, which was found on the toilet floor, was admitted in evidence over defendant's objection, and this is assigned as error. The pistol does not appear to have been offered as in any way connected with the shooting of Lee Tai Hoy, but as incident to and connected with what transpired at the time the door was forced, and the defendants and Jo Bong arrested, and we find no error in admitting it. Also, this evidence and that relating to the Bow On Tong, the trouble in it, the fact that defendants and decedent, as well as the witnesses, were members of it, justify the instruction defining and limiting the purpose and effect of the evidence relating to the Bow On Tong, and was not an invasion of the province of the jury. Exceptions were also taken to questions asked defendant upon his cross-examination.

7. For the purpose of establishing an alibi, defendant on his own behalf testified that from 10 minutes past 6 o'clock P. M. on the day of the homicide he was not out of his rooms on Second and Oak streets until he was arrested about 8 o'clock P. M... He also testified at length as to what took place at the hospital when he was taken there by the officers immediately after the arrest for identification by the wounded man. The cross-examination related among other things to whether or not Jo Bong, whom he named as one who had eaten supper there, had gone out of the rooms during the time referred to and how long he had been gone; also, as to his acquaintance with, and his identification of, Lee Tai Hoy and Lee Hueng, who were at the hospital, and as to whose statements he had testified on direct examination. To all of this cross-examination defendant objected on the ground

that it was not cross-examination and made defendant a witness against himself. The State had a right to examine him as to the circumstances bearing upon the alibi, both as to the fact of his presence in the rooms and anything that might bear upon the truthfulness of his statements in relation thereto, and the same is true as to his acquaintance with decedent and Lee Hueng, so far as it relates to his identification of them; also, in his direct examination, defendant testified that his name was Lum Suey, and not Lem Woon, and the same objection was made to the inquiry by the State as to his statement made upon his arraignment, that his name was correctly stated in the information and as to the proceedings at the preliminary examination where he was referred to only as Lem Woon. We think this was all strictly within the State's right of cross-examination. It was germane to statements made in his direct examination upon these matters. Section 1400, B. & C. Comp., makes a defendant in a criminal action competent as a witness on his own behalf, and, when offering himself as a witness, he shall be deemed to have given the prosecution a right to cross-examination upon all the facts to which he has testified tending to his conviction or acquittal. The scope of such cross-examination is now settled by the case of *State* v. *Bartmess,* 33 Or. 110, 124 (54 Pac. 167, 171), where Mr. Justice MOORE, speaking for the court, says:

"A fair construction of the statute in question leads us to conclude that defendant in a criminal action, having voluntarily testified in his own behalf, may be cross-examined in relation to all facts and matters germane to the testimony given by him on his examination in chief."

And in *State* v. *Miller,* 43 Or. 325, 330 (74 Pac. 658, 659), Mr. Justice WOLVERTON says:

"The statute, however, is not to receive an unduly restricted or narrow construction, and the cross-examination must extend the inquiry to facts and matters mani-

festly germane and relevant to the facts testified to in chief, tending to their explanation and elucidation, and in this respect may be as searching and broad as the foundation upon which it rests."

And the still more recent case of *State* v. *Deal,* 52 Or. 568 (98 Pac. 165), Mr. Chief Justice BEAN, speaking of the cross-examination of a defendant, says:

"It must now be regarded as settled that it must be confined to matters properly germane to and connected with his testimony in chief. * * In other words, a defendant cannot, under the guise of a cross-examination, be compelled, in violation of Section 11, Article I, of the Constitution of Oregon, to give evidence against himself, but, when he becomes a witness on his own behalf, he waives this constitutional guaranty as to all matters properly connected with his examination in chief, and subjects himself to such cross-examination thereon as may tend to explain, elucidate, or affect the credibility of his testimony, and such cross-examination may be as vigorous, and searching as that of any other witness."

Thus, even if the cross-examination does make him a witness against himself, it is not objectionable on account thereof, provided it relates to matters properly connected with his examination in chief. No error was committed in permitting this cross-examination.

8. There was a conflict in the evidence as to what is the true name of defendant, but that was a question for the jury. Furthermore, the defendant was identified by several witnesses independent of the name. Lee Tai Hoy in his dying declaration pointed him out as his assailant; also, Chung Kim and Lee Shu and Gow Ying Yuen identified him as running from the house immediately after the shooting, and it was for the jury to determine the fact.

9. During the presentation of the State's case, Malarkey called to the witness stand Jung Ah Poo, and, after he was sworn as a witness, Mr. Malarkey stated:

"That the testimony, if any, that this witness will give is in my judgment only hearsay testimony, and I only

called him because of the fact that counsel for the defense has intimated that they want Jung Poo."

Counsel for the defense stated:

"We haven't called him, and we never said we wanted him. We asked one witness where he was, where the man that gave him the information was, and he said he was gone."

Mr. Malarkey replied:

"No; he said he didn't know. Now, here is Jung Poo. I do not offer him as having any personal knowledge of any facts, but, if you want Jung Poo, I do not want you to object when I call him, because you have practically made so much about Jung Poo I do not want any objection on the ground that it is hearsay evidence."

Mr. Logan replied:

"I desire that that be stricken out. This man is on trial for his life, and this is not to be the subject of by-play between counsel. I move to have it stricken out."

The Court:

"I suppose counsel has a right to make his statement when he produces the witness out of the abundance of caution."

Prior to this time Lem Ling, a witness for the State, testified that he had called the police and aided in pointing out to them the defendants, and that he had obtained his information as to who had done the shooting from Jung Poo, and, when cross-examined by defendant's counsel in regard to Jung Poo, Mr. Freeman for the defense stated:

"These men that incited the arrest appear to have disappeared."

Mr. Malarkey:

"Jung Ah Poo will be produced here if you want him."

Mr. Freeman:

"I was taking it from the testimony of the witness that he had disappeared. He didn't seem to know where."

Mr. Malarkey:

"This witness is not his guardian. We will put him on the witness stand if you want to hear him."

Mr. Freeman:

"Then we will find out all about this."

Thus it seems there was an understanding between counsel that the State was to produce the witness, and it may have been a proper precaution for the State to do so before the close of defendant's testimony. Yet we cannot approve of the State's method of doing this. It should not have sworn him as a witness before the close of its case with no intention of asking him any questions. But no ruling was made by the court or exception taken, and no error was committed.

10. As to the seventh assignment of error, defendant states:

"The defendant will insist that it was error on the part of the court to allow the district attorney, a judicial officer of the court, to turn over the prosecution of this case to a special prosecutor, who was in no manner an officer of the court, but was employed by the friends of Lee Tai Hoy as a special prosecutor."

At the commencement of the trial, it is recited in the record that the State was represented by "Mr. John H. Stevenson and J. J. Fitzgerald, deputies to the district attorney of the Fourth Judicial District of the State of Oregon, and Mr. Dan J. Malarkey, special counsel for the State." This is the only reference in the record to the matter. His right to appear was not questioned, nor is the character of his employment stated, and the question is raised here for the first time. Therefore it is not before us for decision.

11. The defendant attempted to show the revengeful disposition of the Chinese people as a race, to the effect that "when a trouble breaks out between two classes, or

factions of the same class, and one man is injured, he does not care particularly whether he gets the assailant or the person who particularly injured him, but is satisfied if he brings injury upon one or the other side or class or faction," and for that purpose called two witnesses, Chas. F. Lord, a white man, and Sam Ah Pye, a Chinese. This was offered, as appears, in connection with and in aid of the other evidence tending to cast doubt upon the identity of the slayer of Lee Tai Hoy; the design thereby being to discredit the State's witnesses. The evidence offered relates to Chinese customs or characteristics, and applies to the race, and not to the individual. But a rule that would admit evidence of such characteristics or customs of a class or a race to affect the credibility of an individual witness of that class or race cannot apply to the Chinese more than to the Negro, Indian, or any other people who practice them. This characteristic of the Chinese, if it does exist among them, is probably outclassed by family or neighborhood feuds existing to this day in certain localities in our own country, where wrongs of generations ago are still being avenged. To admit such evidence would be a dangerous precedent. Testimony should be received only under legal principles and rules of evidence. Section 722, B. & C. Comp., provides that "all persons, without exception (save certain persons who are incompetent) may be witnesses." By Section 695:

"A witness is presumed to speak the truth. This presumption, however, may be overcome by the manner in which he testifies, by the character of his testimony, or by evidence affecting his character or motives, or by contradictory evidence; and where the trial is by the jury, they are the exclusive judges of his credibility."

The court must determine the competency of the witness, but the jurors are the exclusive judges of his credibility and the weight to be given to his evidence. All persons who are competent to testify, regardless of age,

religion, race or color, stand equal before the law under the presumption of this statute. *Shelp* v. *United States,* 81 Fed. 694 (26 C. C. A. 570.) And the circumstances or evidence to affect his credibility must relate to and affect the individual. Anything beyond this would not only be unreliable but dangerous. Wigmore, in his work on Evidence, after discussing at some length testimonial qualifications of witnesses, and comparing the relative credibility of witnesses, and the value of testimony of people of different races and color, says, at Section 516:

"Taking all these considerations together, it may be concluded that any judgment of condemnation for the testimony of aliens in general, or of particular races or peoples, is likely to be, in the first place, absolutely incorrect as not founded on facts; in the second place, relatively unjust, as assuming a superiority of honesty which can only be hypothetical; in the third place, unwise, as tending merely to perpetuate ill-feeling and misunderstanding; and, finally, unsound in principle, as excluding indiscriminately a mass of testimony which ought to be weighed and credited in each individual instance for what it may seem to be worth."

It is said in *United States* v. *Lee Huen* (D. C.) 118 Fed. 442, and indorsed by Wigmore at Section 936, that:

"If it affirmatively appears that a witness has a bias in favor of persons of his own nationality, in whose behalf he is testifying, or against the other party to the litigation, or a bias in favor of persons of his own nationality generally, or against those of another nationality, such fact may be used to discredit his testimony."

And the same rule should apply to a bias of the witness in favor of or against a family or faction to which the wrongdoer belongs, if the latter cannot be reached. But it certainly would be incompetent to show the reputation or trait of character of a class or race of people as to matters that might discredit the race for the purpose of discrediting the testimony of an individual of that race.

Each witness should stand or fall by his own character, motives, or customs, and not that of his race. In *Shelp* v. *United States,* 81 Fed. 694, 698 (26 C. C. A. 570, 574), the same principle was involved and the following instruction to the jury was approved:

"(1) It is a fact that Indians lie, and it is also a fact that white men lie, and some of the most civilized and cultured men are among the greatest liars. The evidence of Indian witnesses is entitled to as much credit and weight as the evidence of white men, and such credibility and weight are determined by the same rules of law. (2) In weighing the evidence of witnesses you have a right to consider their intelligence, their appearance upon the witness stand, their apparent candor and fairness in giving their testimony, or the want of such candor or fairness, their interest, if any, in the result of this trial, their opportunities of seeing and knowing the matters concerning which they testify, the probable or improbable nature of the story they tell, and from these things, together with all the facts and circumstances surrounding the case, as disclosed by the testimony, determine where the truth of this matter lies."

This is in accord with Sections 722, 695, B. & C. Comp., above quoted, that provide that "all persons without exception * * may be witnesses," and "a witness is presumed to speak the truth," and specifying the methods by which a witness may be discredited. The credibility of a Chinese witness must be determined by the rules of law applicable to other witnesses. It is said in *Woey Ho* v. *United States,* 109 Fed. 888 (48 C. C. A. 705), in referring to the credibility of witnesses, that "all people, without regard to their race, color, creed or country * * stand equal before the law." In *McDaniel* v. *Monroe,* 63 S. C. 307 (41 S. E. 456), it is said: "The credibility of a witness is not to be tested by the color of the witness or by the race to which he belongs." And by that test evidence that tends to cast discredit upon the race cannot be received to discredit an individual witness. It is said in

*Shelp* v. *United States,* 81 Fed. 694, 698 (26 C. C. A. 570, 574) :

"The truth is that, in law, both classes stand upon the same plane. The weight and credibility of every witness is to be determined in the manner set forth in the clause marked ' (2),' (of the instruction above quoted), which contains a clear and correct statement as to the duty of jurors in weighing the testimony of the witnesses whether they be white men or Indians."

The result of these discussions, upon this subject, is to the effect that matters by which it is sought to discredit a witness must be such as affect the individual witness. He must be heard and recognized in his individual capacity, and not condemned or discredited because of the race to which he belongs or by its customs or reputation. We find no error in excluding the evidence offered.

12. Defendant also excepted to the court's instruction as to the flight of defendant. There was some evidence tending to show that defendant ran from the place of the shooting immediately after the homicide, and soon thereafter was barricaded in the rooms where he was found and arrested after the officers had forced the door. The term "fleeing from justice," as used in the United States statutes, is defined in *United States* v. *O'Brian,* 27 Fed. Cas. No. 15,908, as "to leave one's home or residence or known place of abode within the district, or to conceal one's self therein with intent in either case to avoid detection or punishment for some public offense against the United States." In the case before us the court left it to the jury to determine whether defendant did flee on account of this homicide, and only charged them as to the effect of such flight, if found by them that he did flee, as bearing upon the probability of his guilt or innocence, and was not an invasion of the province of the jury, and was not error. We find no error in the manner of giving of the instruction asked by Mr. Malarkey, and no objection was taken to the law as stated in the instruction.

Assignments of error 13, 14, and 15 relate to the trial of the defendant upon an information which was filed under Section 1258, B. & C. Comp. These questions were decided adversely to defendant's contention in *State* v. *Ju Nun*, 53 Or. 1 (98 Pac. 513), to which we adhere.

The judgment of the lower court is affirmed.

AFFIRMED.

---

Decided December 31, 1910.

ON PETITION FOR REHEARING.

[112 Pac. 427.]

MR. JUSTICE MCBRIDE delivered the opinion of the court.

MR. JUSTICE KING and MR. JUSTICE SLATER dissenting.

All the questions raised on this motion are fully discussed by Mr. Justice EAKIN in the original opinion in this case, which is reported in 107 Pac. 974, and we shall adhere to the views therein expressed.

13. Upon this motion counsel, however, lay particular stress upon the action of the court in admitting in evidence the pistol found by Officer Tichenor in the toilet at the time he arrested Yee Gueng and Jo Bong. Independent of the fact adverted to in the original opinion that the finding of the pistol was an incident of the arrest, and, therefore, admissible, we are of the opinion that upon well-known principles of law it was admissible on other grounds. The evidence of Lee Shu was direct and positive that he saw this defendant and Yee Gueng and another unknown Chinaman in the hall of the building of deceased, assaulting him, and that they each had pistols. Immediately after this, Gow Ying Yuen saw three Chinamen run out of the building, and recognized defendant and Yee Gueng as two of them. They were last seen by him going down Oak Street in the direction of the building in which they were afterwards arrested,

and only a short distance therefrom. In about half an hour the officers arrived at the room where defendants were arrested, and were refused admission. When they finally succeeded in breaking down the door, they found Yee Gueng and Jo Bong concealed in a dark closet, a loaded pistol, which gave evidence of having been recently discharged, lying on the floor of the closet, and Lem Woon in a bunk in the adjoining room.

14. Here is evidence tending to show three things: (1) That defendant was present at the scene of the shooting, in company with Yee Gueng, and that they and another Chinaman were engaged in a felonious assault, with firearms, on deceased. (2) That they fled together to the same building. (3) That a pistol which to all appearances had been recently discharged and reloaded was in the same closet where Yee Gueng had been concealed under circumstances which indicated to any reasonable mind that it was one of the pistols used by the conspirators in perpetrating the murder. Now it makes no difference which one of the three conspirators fired the fatal shot, if the evidence shows that all three were present, aiding and abetting therein. There is strong evidence tending to show that at least three or four bullets were shot from the pistol of Lem Woon, but several bullets are not accounted for, and not found, and the evidence of Tichenor is to the effect that the pistol found by him in the closet when he arrested Yee Gueng showed powder stains in the barrel, indicating its recent use. These circumstances show a criminal conspiracy between Yee Gueng, Lem Woon, and another Chinaman to murder the deceased. Nor does the admission of the pistol in evidence come within the rule that under most circumstances forbids the introduction of testimony as to acts or declarations of a conspirator after the termination of the conspiracy. The finding of the pistol and its con-

dition was neither an act nor a declaration. It was a fact indicating that when Yee Gueng was seen with defendant, armed and assaulting the deceased, he was doing so with intent to murder, and assisted in its perpetration; and this intent and the consequences of it are imputable to the defendant, who, as other evidence tends to show, was present, assisting in the commission of the crime. The pistol was no more an act or declaration of Yee Gueng than was the closet in which he was arrested. It was a mute, but forceful, witness, corroborating the testimony of Lee Shu that the defendant and Yee Gueng were armed at the scene of the shooting. It further tended to show that the purpose of their being there was homicidal, and, in some degree, that it had been used for the purposes of the murder.

It is significant that the defendant and Yee Gueng were never so far as the testimony discloses twenty feet apart from the time the homicide was committed until they were arrested. They were seen together armed at the scene of the shooting; they were seen running away together from the scene of the crime; and they were arrested in the same building, a very short time afterwards, in rooms in close proximity to each other.

In a somewhat extended experience in criminal trials, the writer has never seen a case of murder in the first degree more clearly and conclusively proved, and to seek now some mere pretext to set aside a verdict obtained after a fair and impartial trial would be to encourage crime and make a mockery of the law.

The petition is denied.

AFFIRMED: REHEARING DENIED.

MR. JUSTICE KING delivered the following dissenting opinion.

At the time of the filing of the former opinion, I acceded with some hesitation to the conclusion there

announced, but after a careful re-examination into the errors assigned, and the law and evidence applicable thereto, I am unable to concur in the conclusion reached by the majority.

It will be remembered that Lem Woon at the time of his arrest, while in what is termed the same apartments as those occupied by his codefendant, was not one of the two Chinamen found hiding in the toilet where the pistol was discovered; the accused, when arrested, being in an adjacent room, and there is no testimony tending to show that the 41 Colt's revolver, offered in evidence, was at any time in his possession or under his control, nor does it appear that Lem Woon was in hiding or attempting to escape detention further than that he was in a room adjoining the one occupied by his codefendant, and that the entrance to the entire apartments was barred, these rooms being the regular abode of the defendant and nine or ten others of his race. The revolver was admitted in evidence against him over the timely and proper objections of his counsel. It is well settled that subsequent declarations and acts, unless shown to be intimately and closely connected with the transaction, are not admissible against one accused of a crime: *State* v. *Smith,* 43 Or. 109 (71 Pac. 973; *State* v. *Ching Ling,* 16 Or. 419 (18 Pac. 844). The weapon was found in the place where Yee Gueng and Jo Bong were hiding, under such circumstances, and in such close proximity to them as to indicate its contemplated use by them in resisting arrest, if necessary, thus indicating to some extent at least that they were attempting to escape, from which guilt might be inferable, and so justify the revolver's admission in evidence against them, as held by us in *State* v. *Yee Gueng,* (decided at this time) 112 Pac. 424. But, so far as serving to connect this defendant with the crime, the same rule does not apply. If admissible at all, it is only

on the theory that it was a circumstance incident to the arrest, tending to show an effort to escape or in some manner to elude the officers. This assumption cannot be held, for the weapon was not in Lem Woon's possession, and the fact that it was found in an adjacent toilet, occupied by others, is too remote. In this connection it must be remembered there were nine other regular occupants of the apartments at the time; that is, the quarters occupied by them was a Chinese lodging house. The mere fact that the Chinese society had formerly met there at various times was insufficient to justify the admission in evidence of the pistol in question against any or all persons happening to be either a member of such society, or found to be rooming in the quarters, without in some manner connecting them also with the weapon offered in evidence. This revolver was in the same position, with reference to its admissibility, as was the box of firearms found, the admission in evidence of which the court refused. To admit the weapon, under the proof accompanying it, is to rely on an inference from an inference, and not a deduction from an established fact, and this character of evidence is expressly excluded by Section 785, B. & C. Comp., which provides that the inference must be founded:

"(1) On a fact legally proved; and (2) on such a deduction from that fact as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature."

It will thus be seen that an inference could only be founded on a fact legally proved. No fact is here proved from which it may be inferred that this defendant owned the weapon in question, or in any manner possessed or intended to use it in resisting arrest. The circumstance of the door being locked indicating to some extent that

he was evading the officers, and affording equal protection to all the occupants against arrest, might, if offered, have entitled the lock to admission in evidence; for, that fact once established, its purpose creates an inference as much against one occupant as another, the weight to be given thereto depending largely upon the conduct thereof after the door was forced open. This feature, however, was proved, and from it the jury might have inferred all were avoiding arrest, but these inferences were from established facts, and not inconsistent with the usual propensities or passions of men, mentioned in the above section of the code.

Not so, however, as to the pistol admitted. No proof whatever appears associating defendant with it. To connect him in any manner therewith it must be inferred that he either owned the weapon or placed it in the toilet in which others were hiding, and from that again infer that the motive for which it was placed in the toilet was for its use in resisting arrest by the occupants, of which he was not one. This is not only too remote a circumstance to entitle the weapon to admission, but is in violation of the above section of the statute: *State* v. *Hembree,* 54 Or. 463 (103 Pac. 1008). See, also, 8 Cyc. 680; 6 Ency. Ev. 699; 2 Wigmore, Ev. § 1157, p. 135; *McBride* v. *Commonwealth,* 95 Va. 818 (30 S. E. 454); *State* v. *Arthur,* 129 Iowa 235 (105 N. W. 422); *State* v. *Kehr,* 133 Iowa 35 (110 N. W. 149); *Riggins* v. *State,* 42 Tex. Cr. R. 472 (60 S. W. 877). Mr. Wigmore condemns the practice of admitting this class of testimony, and the Encyclopedia of Evidence, above cited, holds that "as a circumstance tending to connect the accused with the act charged, it is competent to show his possession of a deadly weapon or instrumentality similar to that with which the homicide appears to have been committed, at the time thereof, or within a reasonable time previous or subsequent, or that he prepared such a weapon for

use. But it is not proper to show the possession of a weapon with which the wound could not have been inflicted." The rule thus stated is fully sustained by the other authorities cited. Under the authority of *State* v. *Wintzingerode*, 9 Or. 153, we held this class of evidence in Yee Gueng to be admissible against those found in possession of the weapon, or in whose special hiding place it was discovered, but the same reasons cannot be invoked for its admission here.

That the admission of the weapon in evidence against this defendant must have prejudiced the jury against the accused seems clear—as much, if not more, than did the admission of the photographs admitted in evidence in *State* v. *Miller*, 43 Or. 325, 328 (74 Pac. 658, 659), on account of which a new trial was ordered. The observations in that case on this point apply with equal force here. After stating that photographs under some circumstances (concerning which the same may be here remarked with regard to firearms) are admissible, and after illustrating the class of cases in which they may properly be offered in evidence, Mr. Justice WOLVERTON remarks: "But unless they are necessary in some matter of substance, or instructive to establish material facts or conditions, they are not admissible, especially when they are of such a character as to arouse sympathy or indignation, or to divert the minds of the jury to improper or irrelevant considerations"—citing *Baxter* v. *Chicago & N. W. R. Co.*, 104 Wis. 307 (80 N. W. 644) ; *Selleck* v. *City of Janesville*, 104 Wis. 570 (80 N. W. 944 : 47 L. R. A. 691 : 76 Am. St. Rep. 892) ; *Fore* v. *State*, 75 Miss. 727 (23 South. 710). So it may here be said that the admission of a weapon in evidence, not shown in any manner to be connected with this defendant, tended to divert the minds of the jury to improper and irrelevant considerations. Especially must this be true when it is remembered that the excluded box of weapons was during a

large part of the trial permitted to remain in sight of the jury, to which was added the circumstance of the special counsel for the State requesting the witness by whom the revolver was identified to go to the box of weapons and take out this one, which the witness, in the presence of the jury did. All of this tended to direct the attention to the jury to the wholesale collection of weapons excluded, which were clearly inadmissible—as much so as weapons found in a gunsmith's shop adjacent to a room occupied by one charged with murder.

Error is also predicated upon the remarks and interrogatories of the special counsel during the trial, much of which is set out in the former opinion in this case, the objection and consideration of which also excludes the alleged error of the court in admitting much of the cross-examination of Chin Ling, a witness for the State. The cross-examination of this witness in my opinion was permitted to be extended beyond reasonable limits. Much of it had no reference directly or indirectly to anything brought out on the direct examination. Regardless of this feature, however, the conduct of the special counsel, adverted to in the former opinion, in placing Jung Ah Poo upon the witness stand in the manner complained of, and in bringing matters before the jury by remarks and interrogatories held to be highly improper (even though objections to much of the course pursued were sustained), manifestly tended to prejudice the rights of the accused, and, while probably no one of the statements or remarks could be deemed sufficient to justify a reversal, yet taken as a whole they must, unless we disregard the legal rights of the accused, make a reversal necessary. The impropriety and the prejudicial effect of the interrogations and remarks of the character complained of are fully and ably considered in *People* v. *Wells*, 100 Cal. 459, 461 (34 Pac. 1078). In that case the defendant was charged with forgery. A Mr. Staniels was put on the stand as a

witness for the prosecution.   Afterwards the captain of
the police, as a witness for the state, was examined, and
the prosecuting attorney asked him this question:

"I want to ask one leading question, and do not answer
it until counsel has an opportunity to object.   Is it a fact
that a short time after that Staniels came to you and
reported about Wells wanting him to tell the woman to
skip?"

To this inquiry an objection was made and sustained.
In referring to this interrogatory the appellate court
observed:

"There was not the slightest excuse for asking this
question. * * What, then, was its purpose?   Clearly, to
take an unfair advantage of appellant by intimating to
the jury something that was either not true, or not
capable of being proven in the manner attempted.   And
the wrong was not remedied because the court sustained
an objection to the question."

The court then proceeds to discuss other interrogatories
of like character, which it will be noticed were analogous
in effect and propriety to those here under consideration,
and the observations concerning which apply with equal
force to those here presented, upon which a reversal is
asked.   Mr. Justice MCFARLAND remarks:

"The inexcusable asking of the foregoing question
would not be perhaps of itself sufficient ground for revers-
ing the judgment, but it is of importance when taken
in connection with questions asked the defendant when
a witness, as showing the general manner and temper
with which the prosecution was conducted.   Upon cross-
examination of appellant the prosecuting attorney asked
him these questions: Where did you formerly reside?
Do you know the Highland National Bank of Newburgh,
N. Y.?   Were you married to your present wife when
you came here with her?   Did you not admit in a letter
to Mr. M. C. Belknap that in November, 1893, you forged
your father-in-law's name to a note in New York?'   To
these questions counsel for appellant objected as incom-

petent, immaterial, irrelevant, and not in cross-examination, declared that they were unfair to appellant, and asked the court to instruct the district attorney not to ask any more such questions. The record merely shows that after discussion the objections were sustained. The first three of these questions are important mainly as leading up to the last one, the asking of which was utterly inexcusable and reprehensible. It would be an impeachment of the legal learning of the counsel for the people to intimate that he did not know the question to be improper and wholly unjustifiable. Its only purpose, therefore, was to get before the jury a statement in the guise of a question, that would prejudice them against appellant. If counsel had no reason to believe the truth of the matter insinuated by the question, then the artifice was most flagrant; but, if he had any reason to believe in its truth, still he knew that it was a matter which the jury had no right to consider. The prosecuting attorney may well be assumed to be a man of fair standing before the jury, and they may well have thought that he would not have asked the question unless he could have proved what it intimated if he had been allowed to do so. He said plainly to the jury what Hamlet did not want his friends to say 'As, well we know;' or, 'We could, an if we would;' or, 'If we list to speak;' or, 'There be, an if there might.' This was an entirely unfair way to try the case; and the mischief was not averted because the court properly sustained the objection, though we think it should have warned counsel against the course which he was taking, and instructed the jury specially on the subject. The wrong and the harm was in the asking of the question. Of course, in trials of criminal cases, questions as to the admissibility of evidence will frequently arise about which lawyers and judges may fairly differ in opinion; and in such cases defendants must be satisfied when courts sustain their objections. But where the prosecuting attorney asks a defendant questions which he knows, and every judge and lawyer knows, to be wholly inadmissible and wrong, and where the questions are asked without the expectation of answers, and where the clear purpose is to prejudice the jury against the defendant in a vital matter by the mere asking of the questions, then a judgment against the

defendant will be reversed, although objections to the questions were sustained, unless it appears that the questions could not have influenced the verdict."

The holding in the above case is fully sustained by the great weight of authority. In fact, but few cases may be found where a continued course or attempt to ask questions ruled out by the court, tending to convey to the jury matters not admissible in evidence, and which, by their nature, are damaging in effect to the accused, have not resulted in a reversal: *State* v. *Blodgett,* 50 Or. 329 (92 Pac. 820) ; *State* v. *Bartlett,* 50 Or. 440 (93 Pac. 243: 19 L. R. A. (N. S.) 802: 126 Am. St. Rep. 751) ; *State* v. *Reed,* 52 Or. 377 (97 Pac. 627).

As to other errors assigned, I express no opinion. I deem the errors above considered ample to disclose that defendant did not receive the fair and impartial trial guaranteed by law to all persons, regardless of race or station in life, the recognition of which by the courts is essential to the safety of our citizens and to the perpetuity of our form of government.

The judgment should accordingly be reversed and a new trial ordered.

Mr. Justice SLATER concurs in this dissent.