COMMONWEALTH v. HENRY A. MOSIER.

APPEAL BY DEFENDANT FROM THE COURT OF QUARTER SES-
SIONS OF McKEAN COUNTY.

Argued May 8, 1890—Decided May 19, 1890.
[To be reported.]

1. An indictment for adultery should not be quashed merely because it ap-
pears that the defendant's wife was examined before the grand jury as
a witness. In the absence of anything to show what she testified to, the
presumption is that she was examined only to prove the fact of marriage,
as to which she was competent under § 2 (*b*), act of May 23, 1887, P.
L. 158.

2. The fact that a person, called as a juror in a criminal case, had conversed
with the defendant during the sitting of the court, though not about the
case, and had exchanged drinks and cigars with him, is sufficient cause
of challenge proper affectum; at all events, the juror's exclusion does
not injure the defendant, who has no right to have any particular juror
sworn.

Statement of Facts.

3. Where a defendant, indicted for adultery with C., upon his examination in chief has denied the commission of adultery with C., either on the date laid in the indictment or at any other time, he may be asked, upon cross-examination, whether he did not plead guilty in Ohio to a charge of adultery with C., and why he did so.

4. It is not error to instruct the jury, upon the trial of an indictment for adultery, that the law would fully warrant their inferring the commission of the crime charged, from the fact that a man and a woman, not husband and wife, were occupying the same room, undressed, in the night time.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS and MITCHELL, JJ.

No. 396 January Term 1890, Sup. Ct.; court below, No. 21 February Term 1890, Q. S.

On February 25, 1890, the grand jury returned as a true bill an indictment charging that Henry A. Mosier, on January 13, 1890, committed adultery with one Mrs. Lena Clayton, she not being his lawful wife, and he being a married man and having a lawful wife alive, to wit Annie Mosier. By an indorsement upon the indictment, it appeared that Annie Mosier, the wife of the defendant, was among the witnesses who were examined before the grand jury.

When the case was called for trial, on February 28, 1890, J. D. Larkins, being called as a juror, was sworn and examined upon his voir dire, and testified in substance that he and the defendant were staying at the same hotel while in attendance upon the sessions of the court; that they had met at the hotel without any previous acquaintance; that the witness had invited the defendant, upon the latter's complaining of feeling lonesome, to "go and take something," and they went into the bar-room of the hotel where the witness took whiskey and treated the defendant to a cigar; that subsequently the defendant said to the witness, "Say, partner, will you take another cigar?" and, receiving an affirmative response, bought a cigar for the witness; that the defendant had made the witness an offer of a drink, which the witness declined; that the witness had talked with the defendant about other matters, but had never talked with him about the case on trial. Counsel for the commonwealth asked that the juror be excused for cause.

Objected to for the defendant, for the reason that there was no cause shown.

Statement of Facts.

By the court: Challenge for cause sustained and juror excused; exception.[1]

The defendant's counsel then moved to quash the indictment, for the reason that the wife of Henry A. Mosier, the defendant, was called before the grand jury at the hearing of the case, and was there by the said grand jury sworn, and testified as a witness against her husband, contrary to law.

By the court: It appears that the wife was called before the grand jury. The law makes her a competent witness to prove a certain thing there. Are we to presume that she testified to anything that was illegal or improper? The district attorney is a sworn officer representing the commonwealth, and he has a right to be before the grand jury and assist in examining witnesses. . . . . I would be inclined to permit you, if you wish, to interrogate the district attorney whether or not he was present before the grand jury, and what she was examined upon in this case. Mr. Mullin and the district attorney and myself talked this matter over, and he was instructed by me, and of course knew the law itself before, to take this woman before the grand jury and prove the marriage and then bring her out. In the absence of any showing that she testified to anything improper before the grand jury, we are clear that we ought to presume that everything was regularly done. If you could prove by any one that she was interrogated and testified to anything but the marriage, we would quash the indictment, because it would be clearly wrong. I do not wonder at all that you made the motion, taking the situation of things here; but there being no showing upon the subject whatever, the court presumes that the wife of the defendant was called before the grand jury under the direction of the district attorney, who had a right to be present and interrogate her, and that her testimony was upon the question of marriage and nothing else. It is conceded that she was before the grand jury. We think the presumption is that she testified only to what the law permitted her to testify to, there being no showing on the subject. The motion is denied; exception.[2]

Thereupon the defendant pleaded not guilty, and the jury was sworn.

The trial proceeding, after calling Annie Mosier, who testified that she was married to the defendant on November 12,

Statement of Facts.

1881, the commonwealth called W. W. Tadder. This witness testified that he was a constable and police officer at Bradford; that, having received warrants for the arrest of the defendant and Mrs. Clayton, the witness went to the house of the defendant's father, at Tarport, on the morning of January 13, 1890, a few minutes before 4 o'clock, in company with John Finnerty, Roy Edgett and one Haverman; that, on arriving at the house, the witness knocked loudly a number of times at the side door, and while doing so he heard a dog barking; that no one coming to open the door, the witness, after trying to get in for about fifteen minutes, went around to the front door, pushed it open and entered the house; that just as he struck a match, the witness saw the defendant's sister, in her night clothes, coming from the direction of a bed in one of the rooms down-stairs; that she was about four feet away from the bed when the witness first saw her, and she at once ran across the hall and into another room in which the witness found the defendant's father and mother, the mother being in bed and the father standing at the door of the room; that, proceeding up-stairs, the witness found the defendant and Mrs. Clayton in a room together; that the defendant had on merely his shirt and drawers, and was seated on a chair engaged in drawing on his stockings; that Mrs. Clayton had on no clothing except a night-gown, and was kneeling at the foot of the bed; that the pillows upon the bed indicated that two persons had been occupying it; that the witness had Haverman sent up-stairs, and he identified the defendant and Mrs. Clayton for him. Finnerty testified that two or three minutes after Tadder had gone up-stairs, he called the witness, who went up in answer to the call and was told to call Haverman up; that when the witness entered the room, the defendant was pulling on his trousers and Mrs. Clayton was just getting into the bed.

The testimony of the defendant, his father, his sister and Mrs. Clayton, was to the effect that on the night of the arrest the defendant slept down-stairs with his father, the mother slept down-stairs by herself, and the sister and Mrs. Clayton occupied together the room up-stairs; that, when aroused by the noise made in the efforts of officer Tadder to get into the house, the inmates supposed that burglars were endeavoring

Statement of Facts.

to enter; that the defendant's sister thereupon started down stairs, feeling that she would be safer where the men were, and at the foot of the stairs met the defendant, who had his trousers on and had his outside shirt in his hand, and was on his way up-stairs to get a revolver from his trunk, which was in Mrs. Clayton's room; and that it was not more than a minute or a minute and a half from the time the defendant started up until he was followed by Tadder.

The defendant testified, on his direct examination, as follows:

Q. Now state whether on that night or any other time you committed adultery with Mrs. Clayton? A. No, sir.

On cross-examination he was asked: Q. Why did you plead guilty to the crime of adultery in Ohio with her?

Objected to, that they can only prove this by the record.

By the court: I think it is proper on the question of credibility, if nothing else.

Defendant's counsel objects to the question as incompetent and not cross-examination, and that a former conviction or indictment can only be proved by the record.

By the court: This is not offered nor admitted for the purpose of showing a former conviction; but, the witness having testified that he never committed adultery with the woman named, at any place, he is allowed to be cross-examined as to other statements that he has made that may be inconsistent with this; exception.[3]

A. Why, my wife wished a divorce, so I understood, and I thought I would give her grounds to get one if she wished it.

Both the defendant and Mrs. Clayton were cross-examined at length in regard to occurrences that had taken place in Ohio. From their testimony it appeared that in June, 1889, the defendant and his wife separated in consequence of a letter received by her from the husband of Mrs. Clayton charging that the defendant had been criminally intimate with the latter; that subsequently, Mrs. Clayton having left her husband, she and the defendant met by appointment at a hotel in Toledo, Ohio, where they both passed under the name of Morris, and remained together in one room during the night, though they both denied upon the stand that they were in bed together, and testified that they sat up, talking, until morning;

### Charge of Court below.

that in the morning they were arrested upon a charge of adultery, to which they pleaded guilty, being punished by a fine; that they then went to Findlay, where Mrs. Clayton went into partnership with a widow in keeping a boarding house, at which the defendant boarded; that they came from Findlay, together, to Tarport, about one week prior to their arrest there, the defendant's mother, who was sick, having sent an invitation to Mrs. Clayton to come. Mrs. Clayton testified that she came expecting to get music scholars at Tarport and Bradford, and to render any assistance about the house that might be needed in consequence of Mrs. Mosier's sickness.

Testimony for the commonwealth in rebuttal tended to show that soon after the arrest, Mrs. Clayton and the defendant's sister gave a different explanation of the defendant's presence in the room with Mrs. Clayton at the time of Tadder's arrival, from that given in their testimony.

At the close of the testimony, the court, MORRISON, J., charged the jury in part as follows:

The commonwealth alleges that upon this day or night, the night of January 13, 1890, the crime of adultery was committed in the house of the defendant's father, in the borough of Kendall or Tarport in this county, and to support that allegation they place on the stand, first, the wife of the defendant to prove the marriage. It is an essential thing in a charge of this kind to prove that the defendant was a married man at the time; if not, the crime of adultery could not be committed by him. Mrs. Annie Mosier testifies that he was married to her about eight years ago. You heard her testimony and that was all the testimony she was competent to give. This testimony is not denied, and it is all the testimony there is on the subject. Does this satisfy you that the defendant was a married man at the time that it is alleged he committed the offence charged in this indictment? . . . . .

—After reviewing the testimony of Tadder and Finnerty for the commonwealth, the court continued:

Now gentlemen, if this were all there is in the case, it would be our duty to say to you that, if you believed this, it would make a strong circumstantial case from which the jury would be justified in inferring that the parties had occupied that

room and bed that night; and, if you are satisfied that Mrs. Clayton was not the wife of the defendant, and that he had a lawful wife then living; if you should reach the conclusion under all the evidence that they were in that room getting up at that time on account of the interruption, having been in the bed undressed as the witness testifies, it would justify you in inferring from this that they had committed adultery that night. Jurors are permitted and entitled to draw legitimate inferences from what is proper; and if you should reach the conclusion under all the evidence that these parties, not husband and wife, and the defendant a married man, and the woman from her own testimony on the stand a married woman, married to another man; if you should reach the conclusion under all the evidence in the case that they had occupied that bed that night, and were getting up at the time Mr. Tadder says he went up there, in their night clothes, you would be fully justified in inferring that they had committed adultery. [What other inference can you draw from the fact of a man and woman, not husband and wife, occupying the same room and bed, undressed, in the night time? The law would fully warrant you in drawing such an inference.] [4] . . . . . Now we say to you, at this time, that this defendant cannot be convicted for adultery with this woman at any other time or place than the one mentioned, January 13, 1890. It makes no difference what you might conclude as to what took place in Ohio. They cannot be tried in Pennsylvania for what was done in Ohio, and the commonwealth offered no evidence in chief as to any irregularities or improper conduct between the parties in Ohio.

Now, in reply to this, the defendant puts upon the stand his sister. She testifies that she had been sleeping with this woman that night and heard the fuss down-stairs, that she supposed was burglars, and ran down stairs, and as she went down stairs she met her brother with some of his clothes in his hand going up stairs; and she testifies, as we understand her, that it was not more than a minute and a half from the time she saw her brother going up stairs that Tadder went up stairs. Now you will recollect Mr. Tadder's testimony as to where he says she was when he got in; where he found all of the parties. She says that her mother slept alone, and that this defendant and her father slept in one bed, and that she slept all the time

Charge of Court below.

that Mrs. Clayton was there with her up-stairs. The father of the defendant testifies in substance something similar; that he occupied a certain bed, and his son slept with him that night; that he did not get up, as we understand him, until the alarm; until his son got out of bed and started.

Now it is your duty to scan this evidence, both on the part of the commonwealth and on the part of the defendant himself. You have a right to consider the probability and the reasonableness of the stories that the different witnesses tell, in endeavoring to arrive at the truth in this matter. [You have already seen that it is of very vital importance whether the defendant was sleeping down-stairs and the young woman sleeping up-stairs, as she and her father testify, or whether she was sleeping down-stairs and was near her bedroom door when Tadder came in, as he says, and whether the defendant was getting up in the room where Mrs. Clayton slept. It is of vital importance. The explanation made by the young lady of why she came down, is that she heard this alarm of burglars and wanted to get down where the men folks were. The explanation of the defendant, is, if we understand it, that he went up stairs to get his revolver. Now, it is for you to consider in arriving at the truth of this, who is telling the reasonable story. There is a contradiction here between Tadder's testimony and the theory of the commonwealth, and the defendant's theory. If persons were breaking into the house supposed to be burglars, would the defendant be likely to go up-stairs and remain there dressing in the manner described, or would he remain down-stairs? Would the young lady, who was up-stairs as she says, if she thought burglars had broken in down below, be likely to run down there in the dark where the burglars were? These are for you to consider. It is not for us to say who is telling the truth or testifying falsely. Either Miss Mosier slept up-stairs with that woman, or else she and her father and the defendant, it would seem to us, are testifying falsely. It would seem that they ought to know where the different parties slept in the house that night.] [5] It is also in evidence that the trunk of the defendant, and the trunk of the alleged particeps criminis, were up-stairs in this bedroom; and it is also testified to by some one that he went up there to look for his revolver, and that Mrs. Clayton said it was in his trunk.

Charge of Court below.

All of these circumstances you should recall, and everything that is testified to, and try to get at the truth in this matter.

[In addition to these witnesses, the defendant takes the stand and denies the commission of adultery, then or any place else. He was cross-examined at length, and we permitted the cross-examination leading into Ohio, etc., as we deemed it our duty to do as affecting the question of his credibility; of whether or not you could rely on his testimony upon the stand in denying this adultery.] [6] When a party takes the witness stand, the jury is entitled to know the party's interest in the matter, or his bias, or his situation, so as to judge whether or not he is telling the truth. Now you will recollect that he states on the stand, admits that he staid over night at a hotel in Toledo under a false name, and that this woman Mrs. Clayton staid there under the same name, and he admits he went to her room and saw her, as we understood him, in the morning. He says that he got there about 11 o'clock at night and registered this name "Morris"; and it appears also from her testimony, I think, that her name was registered as Mrs. Morris, although she did not register it herself. Now he says he saw her a while in the morning. It appears that they were arrested there in the morning, as I understand the testimony. She says on the stand that he came there to her room, when he came, about 11 o'clock at night, and stayed there all night; that they talked until morning. Now this shows the intimacy of the relation between these parties, and we say to you that you are to consider it as affecting their credibility as to the story they are telling now. [They both deny the adultery. The defendant denied it here, or any where else, and Mrs. Clayton said she did not commit adultery with him this night at Tarport.] [7]

[Now a defendant in a criminal case, until lately, was not a witness. Of course he has a vital interest in this matter, as his counsel said, and the question of whether his interest would prevent him from telling the truth or lead him to testify falsely is for your consideration. You take the witnesses in the situation you find them, and you say, taking the circumstances in which they are placed, whether or not their testimony is reliable. Now, as to the testimony of Mrs. Clayton: at one time, not a great many years ago, the defendant could not

Charge of Court below.

have been a witness, but the alleged paramour or particeps criminis could then have been a witness; but the law then said that the testimony should be scrutinized very closely. Some of the authors say it is weak testimony, because a person with whom an adultery is alleged to have been committed has a very deep interest in whether or not the defendant is proven guilty. Even if she was never tried, it would affect her social standing and position, if it were found by a jury that the defendant who was charged with committing adultery with her was guilty. Therefore we say that the law, when the defendant could not have been a witness, would have made her testimony subject to very close scrutiny. Now that every party is a witness, you have to take the situation and consider whether or not their testimony is reliable.] 8

The defendant, like every other defendant, is entitled to the benefit of a reasonable doubt. The commonwealth undertakes by her witnesses to satisfy you beyond a reasonable doubt that this offence was committed at this house, on this night at Tarport. We have already said to you that if the commonwealth have satisfied you beyond a reasonable doubt that they occupied that bed together that night, you can legitimately draw the inference that they had unlawful sexual intercourse there, and the crime of adultery was complete. Then the question for you to get at is the truth of this, and that is an important matter. It is important both to the defendant and to the commonwealth. . . . . .

[You are not to convict the defendant on anything that took place in Ohio, but you are to consider all that is in evidence, that is alleged to have taken place in Ohio, as affecting the question of his guilt or innocence at Tarport, at the time the commonwealth alleges that he slept with this woman and had criminal intercourse with her. You are to take that into consideration as to whether or not you can rely on what he tells you now and what she tells you.] 9 If she had left her husband, and he had left his wife, as it seemed to be proved and not contradicted, and they had met in various places and staid at the hotel under a fictitious name, it shows a relation of intimacy between them, and it has a bearing on the question of whether or not you can rely on her testimony when she takes the stand in his behalf, or whether you can rely on his

Arguments.

testimony. It is a question for you. We do not say to you that it discredits these witnesses, but we say you can take this all into consideration in coming to a conclusion whether or not their testimony can be believed. [You take into consideration the interest of the witnesses connected with the case, whether the commonwealth's witnesses or the defendant's witnesses; whether it is his relatives or whoever it is; whether it is the officer who executed the writ. If you discover in the circumstances of the witnesses anything that discredits them or would tend to discredit them you will consider it.] [10]. . . .

A juror: I am in doubt about one thing. If Tadder's evidence is correct, as he broke open the front door the girl was in the first room; according to their evidence there was no bed in the front room ?

By the court: [The jury will have to recall how that evidence is, and if there is any material difference of recollection and it becomes important, you can have the reporter read it for you. It is not for us to undertake to say what the evidence is.] [11]

The jury rendered a verdict of guilty. A rule for a new trial having been discharged by the court and sentence of fine and imprisonment pronounced, the defendant obtained a special allowance and took this appeal, assigning for error:

1. The sustaining of the challenge of the juror Larkins.[1]
2. The refusal to quash the indictment.[2]
3. The admission of the commonwealth's offer.[3]
4–11. The parts of the charge embraced in [ ] [4 to 11]

*Mr. P. R. Cotter,* for the appellant:

1. A defendant has a right to a trial by the jurors called, unless they be stood aside or peremptorily challenged by the commonwealth, or some disqualifying cause be shown against them. To sustain a challenge proper affectum, when the objection is not on account of relationship, it must be shown that the party holds a position in which he might exercise a control over the juror: Cummings v. Gann, 52 Pa. 484. Mere intimacy, or even the relation of attorney and client, is not sufficient cause: Rex v. Geach, 9 C. & P. 499; Pipher v. Lodge, 16 S. & R. 214. But the examination of the juror, in this case, exhibited neither

partiality for the defendant, nor any opinion or even knowledge concerning the case. As to the refusal to quash the indictment, the fair presumption from the appearance of the name of the defendant's wife among the names of the witnesses on the back of the indictment, is that she was sworn generally and examined as they were. The grand jury, in the absence of special instruction, would see no difference between her and the others. She was incompetent, except to prove marriage: § 2 (b), act of May 23, 1887, P. L. 158. Therefore, the indictment should have been quashed: Commonwealth v. Paynter, 8 Phila. 609; Commonwealth v. McEwen, 1 Clark 140.

2. The reason given by the court for permitting the cross-examination of the defendant respecting occurrences in Ohio, was that he had denied the commission of adultery with Mrs. Clayton "at any place." The assumption that he had so testified was an error. The scope of the inquiry involved in the prosecution was whether he had committed adultery with her within the county of McKean. Neither the question put to him, nor his answer, had reference to a crime committed at any other place. Both referred only to the place named in the indictment, and they can by no fair interpretation be tortured into a reference to Ohio, or any other place. This was not proper cross-examination, and was not admissible for the purpose stated by the learned judge. The proper method of proving a crime to affect the credit of a witness, is to offer the record of his conviction: Buck v. Commonwealth, 107 Pa. 486. The error was made more grave by the manner of admitting this cross-examination, viz., by mistakenly assuming that the defendant had made certain statements in his testimony in chief which he did not make, and by afterwards stating to the jury that it was admitted to discredit such statements.

3. In the parts of the charge embraced in the fourth and fifth assignments, the court improperly argued in favor of the theory of the commonwealth, and cast doubt and discredit upon the testimony of the defendant and his witnesses. Moreover, the statements of the learned judge were erroneous. He assumed that Miss Mosier testified she did not come down stairs until the supposed burglars had broken in. Such an inaccurate statement is ground of reversal: Collins v. Leafey, 124 Pa. 203. The sixth and seventh assignments exhibit re-

iterations of an inaccurate statement of the testimony of the defendant, giving it to the jury as an undisputed fact. This was erroneous: Stouffer v. Latshaw, 2 W. 165; Sartwell v. Wilcox, 20 Pa. 117; Whitehill v. Wilson, 3 P. & W. 415; Newbaker v. Alricks, 5 W. 183; Egbert v. Payne, 99 Pa. 239. The court commented unfairly on the weight to be given to the testimony of the defendant, his relatives, and his alleged paramour. These persons were all competent witnesses, and their credibility was for the jury, to be gauged by the same tests as that of any other witness. The adverse criticism and references to relationship, etc., were improper. And the request of the juror for information should have been complied with.

*Mr. George A. Sturgeon*, District Attorney (with him *Mr. Eugene Mullin* and *Mr. T. F. Mullin*), for the appellee:

1. By § 39, act of March 31, 1860, P. L. 385, challenges of jurors in criminal proceedings are committed to the final determination of the trial court. That determination is not reviewable even under the act of May 19, 1874, P. L. 219: Wirebach v. First N. Bk., 97 Pa. 553; Sanchez v. People, 22 N. Y. 147; Costigan v. Cuyler, 21 N. Y. 134; Alexander v. Commonwealth, 105 Pa. 2. Nor can the exception to the decision of the court below be sustained, if considered upon its merits. Social or business relations, or anything showing probable cause of malice or favor to either party, will be sufficient ground of challenge: 3 Bl. Com., 363; Harrisburg Bank v. Forster, 8 W. 304; Proffatt on Jury Trial, §§ 168, 177. The presumption is that the defendant's wife was sworn before the grand jury only as to the matter concerning which she was competent to testify: Cathcart v. Commonwealth, 37 Pa. 108; Taylor v. Commonwealth, 44 Pa. 131; Dougherty v. Commonwealth, 69 Pa. 286.

2. The cross-examination of the defendant as to the occurrences in Ohio was proper, because the commonwealth was entitled, upon the cross-examination, to prove any fact admissible as a part of its case and tending to show guilt of the defendant: Brandon v. People, 42 N. Y. 265; Connors v. People, 50 N. Y. 240; Heard's Crim. Law, 217; Commonwealth v. Nichols, 114 Mass. 285; State v. Ober, 52 N. H. 459 (13 Am. Rep. 88); Wharton's Cr. Ev., § 430; the extent of the cross-examination being

largely subject to the discretion of the trial court, and the exercise of that discretion not being reviewable: Clark v. Trinity Church, 5 W. & S. 266; Rea v. Missouri, 17 Wall. 532; Johnston v. Jones, 24 How. 440; Storm v. United States, 94 U. S. 76; Huoncker v. Merkey, 102 Pa. 462. In Buck v. Commonwealth, 107 Pa. 486, relied on by the appellant, it was proposed to prove, by cross-examining a witness for the commonwealth, that he had been convicted of a crime. In this case the defendant himself was asked simply as to the fact of his pleading guilty. To prove that fact the record was not requisite: 1 Greenl. Ev., 68; Howser v. Commonwealth, 51 Pa. 332.

3. The questions put to the defendant were proper, also, in view of his testimony, on direct examination, that he had not committed adultery at any other time with Mrs. Clayton, both to affect his credibility and as legitimate cross-examination. The question and answer on his examination in chief are too plain to admit of the interpretation now sought to be placed upon them, viz., that they referred to McKean county, only. And there was nothing in the charge calculated to mislead the jury, nor any error in the judge's statement of facts which had an important bearing in the jury's view of the case. When the facts are left for the free action of the jury, a slight inaccuracy of the judge as to the details of the testimony will not be ground of reversal: Yerkes v. Wilson, 81* Pa. 9; Collins v. Leafey, 124 Pa. 203. It is not error for the court to express a mere opinion: McClain v. Commonwealth, 110 Pa. 263; Spear v. Railroad Co., 119 Pa. 61; McConkey v. Commonwealth, 101 Pa. 416; Johnston v. Commonwealth, 85 Pa. 54; Supplee v. Timothy, 124 Pa. 375; McClintock v. Railroad Co., 21 W. N. 133. The charge must be considered as a whole: Alexander v. Commonwealth, 105 Pa. 1; Reese v. Reese, 90 Pa. 89; Penna. R. Co. v. Coon, 111 Pa. 430; Lehigh V. R. Co. v. Brandtmaier, 113 Pa. 610. The inquiring juror was properly answered by an offer to have the testimony read to him.

OPINION, MR. CHIEF JUSTICE PAXSON:

The second assignment alleges that the court below erred in refusing to quash the indictment because the wife of the defendant was examined before the grand jury as a witness,

and testified against her husband contrary to law. It nowhere appears that she testified against her husband contrary to law. The defendant was indicted for the crime of adultery. The act of May 23, 1887, P. L. 158, expressly authorizes the wife to testify to the marriage, upon a charge of adultery against the husband. We have nothing here but the indorsement of the wife's name as a witness on the back of the bill of indictment; and, in the absence of any information as to what she testified to, we must presume she was examined only as to matters to which she was a competent witness.

The objection to the exclusion of the juror, J. D. Larkins, is without merit. The juror was challenged for favor by the commonwealth. It appeared that he had conversed with the defendant, and had exchanged cigars and drinks with him. We think this was sufficient. The commonwealth was not bound to accept a juror who had been on such easy terms with the defendant. Moreover, the latter was not injured because of the exclusion of this juror. He had no right to have this particular juror sworn in the cause. He had a right to be tried by an impartial jury; nothing more. The case is widely different from that of forcing a partial juror into the box against the objection of the defendant. In such case, he is forced to challenge peremptorily to get rid of him.

The third assignment alleges error in permitting the commonwealth to ask the defendant, upon cross-examination, when on the stand as a witness in his own behalf, why he had pleaded guilty of the adultery in Ohio with Mrs. Clayton. The defendant was charged with adultery with this Mrs. Clayton, and in his examination in chief had stated that he had not committed adultery with her on the date laid in the indictment, nor at any other time. The question upon cross-examination was asked, not to show a conviction in Ohio of the offence, but to contradict the witness by showing that he had pleaded guilty in that state to a charge of adultery with Mrs. Clayton. This went directly to contradict and discredit the witness, and we think it was competent. It was his own declaration or admission of the fact, and was not rendered incompetent because solemnly made in the course of a judicial proceeding.

The remaining assignments refer to the charge of the court. In this we see no error. If it bore somewhat hardly upon the

Statement of Facts.

defendant, it is because the facts were against him.   It was not error to say to the jury that the charge of adultery may be inferred from the fact of a man and a woman, not husband and wife, occupying the same bed and room, undressed, in the night time.   The jury had the full benefit of defendant's story about having been alarmed by supposed burglars, and seeking Mrs. Clayton's room, en déshabillé, to get his revolver.   They did not believe a word of it, however, and we do not wonder at it. There appear to have been no burglars about the house that night.

> The judgment is affirmed; and it is now ordered that Henry A. Mosier, the defendant, surrender himself forthwith to the custody of the keeper of the county jail at Smethport, to serve out the unexpired time of the sentence imposed upon him by the court below.