## STATE v. F. A. HURST.[1]

December 15, 1922.

No. 22,883.

Conviction sustained.
    1. The evidence is sufficient to sustain the verdict that defendant procured an assault to be committed.

Improper rejection of challenged juror not prejudicial, when.
    2. Where the court on the challenge of the state, improperly rejects a juror, it will not prejudice the defendant, if he was tried by an impartial jury, and the jury will be presumed to have been impartial if nothing appears to the contrary.

When indictment need not negative an exception in the statute.
    3. It is not necessary, in an indictment, to expressly negative an

•  [1]Reported in 193 N. W. 680.

exception in a statute defining an offense, where the language of the indictment, by necessary inference, negatives the exception.

Corroboration of accomplices—refusal to charge that witness was an accomplice:

4. The court, in charging the jury, stated the law properly as to the necessity of corroboration of accomplices, and as to who are accomplices. It was not error, under such circumstances, to decline to submit to the jury the question whether a particular witness was an accomplice.

Conspirator guilty of what his confederates do.

5. If one conspires with another to commit a crime he is guilty of everything done by his confederates, which follows the execution of the common design as one of its natural consequences, even though it was not intended as part of the original plan.

Declarations of conspirators admissible.

6. Declarations of one conspirator, during the carrying out of the conspiracy, and pertaining to it, are admissible against all. Where there is a conspiracy to commit a series of crimes, this principle applies to declarations, after one is committed, having a bearing on the general plan.

Action of court sustained.

7. The court permitted as extended inquiry as was desirable into the relation of a labor strike to the crime committed.

Rulings of court correct.

8. Numerous rulings of the court are considered and *held* to present no material error.

No new trial because of prosecutor's remarks.

9. Certain remarks of the county attorney excepted to, while unwarranted, were not such as to warrant a new trial.

Defendant and others were indicted by the grand jury of Ramsey county charged with the crime of assault in the second degree. Defendant Hurst was tried separately in the district court for that county before Catlin J., and a jury which found him guilty as

charged in the indictment. From the judgment entered pursuant to the verdict, defendant appealed. Affirmed.

*Stan D. Donnelly* and *Harry Weiss,* for appellant.

*Clifford L. Hilton,* Attorney General, *James E. Markham,* Assistant Attorney General, and *Richard D. O'Brien,* for respondent.

HALLAM, J.

John M. Guise, a high school principal, was assaulted and beaten by two men, while engaged in starting his car in the rear of his home, at about 7:30 a. m. of October 21, 1921. The assault was committed with an instrument, described in the indictment as a blackjack or some other instrument likely to produce grievous bodily harm. It is not claimed that defendant in person committed the assault, but that he procured it to be committed. Defendant was convicted and he appeals from the judgment of conviction.

1. We address ourselves first to the contention that the verdict is not justified by the evidence. The contention of the state is that the assault on Guise was committed by the two men in the mistaken belief that he was John Klaus, business agent of the Printers' Union in St. Paul. The evidence is in substance as follows:

The witness Robert Bryson testified as follows:

His home was in Chicago. On October 17, 1921, defendant employed him, together with two other men, Lombard and Collins, to come to St. Paul to do guard duty, during a printers' strike, for the protection of property and printers' homes. The three came to Minneapolis and to a hotel in that city, Bryson registering under the name of Wilson. On the nineteenth, defendant called for them in an auto, and drove to St. Paul, drove on Lincoln avenue and located the home of Klaus at 1291 Lincoln avenue in part of a duplex house. Guise occupied the other part. Both used the same garage in the rear of the house. Defendant said several of his men had been beaten up, and Klaus was the instigator of it all, and he wanted him "trimmed," but did not want him seriously injured. As they drove by Klaus' house, defendant said: "He is the fellow he wanted to get," "that he was the instigator of his men being beat up," and "wanted us to make suggestions" he said: "How can

you get him?" Some one in the car suggested ringing the door bell, and, as the man came to the door, "pegging him in the nose." Witness told them that would be a bad idea, that, if they were unlucky enough to get arrested, it would not only be assault and battery, but a charge of house breaking might be laid against them. On the evening of the twentieth, defendant again called for witness, and Lombard and Collins, and they again drove by Klaus' house and discussed again the subject of punching Klaus in the nose. Defendant suggested doing it in the union office or down in the street, and suggested that they come out early the next morning and follow his machine down town, and all agreed to that. It was agreed that they all meet at University and Snelling avenues at 6:30 a. m. next morning, the twenty-first. They did so. Defendant sat in front with the driver. Bryson, Lombard and Collins sat in the back seat. Defendant told the driver where to go. They stopped on Grand avenue, the next street north of Lincoln. The Klaus house was on the north side of Lincoln, and they were then about half a block, across lots, from the garage used by Klaus and Guise. Defendant pointed out the garage, which was in sight, and they all waited in the car for Klaus to get his machine and drive out, and the plan was to follow him down town. After waiting 10 or 15 minutes, Lombard suggested "getting" Klaus as he went into his garage to get his machine. Bryson disapproved of that and left the car and did not return to the party. He did, however, see the car drive away a few minutes later, and saw people running and hollering "get the number of that machine." Klaus was among them. Bryson then returned to Minneapolis, and later met Lombard and Collins. One of them said: "We got the guy." About noon, defendant came to Minneapolis and said: "You fellows will have to get out of town, you got the wrong party, but it is just as good, what you did, because it will have the same impression on my boss, it will show that I am on the job." Bryson then went back to Chicago.

As the car, containing the five men mentioned, stood on Grand avenue, Bryson tore up an envelope addressed to himself at Chicago, on which was written the name of defendant. Mrs. Guise saw the

pieces, picked them up and pasted them together and thus found the writing mentioned. November 14 Bryson was arrested in Chicago. On his arrest, the evidence is, defendant sent a Mr. Carling to Chicago to see that Bryson had legal counsel and to render any assistance he could, and Carling called on Bryson in Chicago. Bryson was, however, brought to St. Paul, and he testified that defendant called on him there, and, using Bryson's language, said: "The main thing to do was to see that he got out and if he got out, why he could do everything for me; if he was in with me that he couldn't do anything, that we would both be out of luck then."

Bryson's testimony clearly shows defendant's participation in the crime. But Bryson was an accomplice and the verdict cannot stand on his testimony, without corroboration.

Brickner, the man who drove the automobile on all the occasions mentioned, also testified. His testimony was in substance as follows:

He was an automobile salesman employed by the Studebaker Company in St. Paul. He met defendant while in the army in France during the war. Early in October, 1919, defendant called at witness' place of business to look at a car advertised for sale. After several interviews, defendant asked Brickner for the use of a car to entertain some friends for three or four days and evenings. Witness got permission to allow defendant the use of a second hand blue Oldsmobile car, and, at defendant's request, Brickner drove this car on the occasions referred to by Bryson. Brickner described the itinerary much as Bryson did. He heard some of the conversations. He heard defendant say they "wanted to get this man." Some of the other conversations testified to by Bryson were detailed. On the evening of the twentieth, defendant arranged with witness to use him and his car at 6 a. m. next day. In order to make it easy for witness, defendant arranged for him to use defendant's room at the Seymour hotel for the night, and this was done. On the morning of the twenty-first, witness met defendant, and drove him in the car to Snelling and University, where they met Bryson, Lombard and Collins. Brickner's account as to what took place up to the time Bryson left the car, confirms Bryson's testimony.

Soon thereafter he said the two others than defendant and himself, in no case does he mention them by name, left the car and went toward Lincoln avenue. He asked defendant what the idea was. Defendant said: "It was nothing." Defendant ordered him to start the motor, and soon the two men came running back and got in, and hollered for him to start, which he did at once, keeping off the main traveled streets under defendant's instructions, went across the Minnesota Transfer and came out on University avenue on the other side of the Transfer. There Lombard and Collins got out. While driving, one of these men described a man, and said he "sure got him proper." Defendant told them he would see them later in the day.

Defendant and witness then started for St. Paul. At the corner of Cromwell and University avenues they were stopped by three men who hailed them for a ride down town. The men were taken on. Defendant got off at St. Peter and Iglehart streets near his home, and witness drove to his place of business, arriving there about 8:15.

Perhaps Brickner was an accomplice. We will refer to that matter hereafter. If so, there was much other corroboration of both Bryson and Brickner. For example:

Witness Beck, Brickner's employer, testified that defendant called at his place of business some time previous to October 21, and was introduced by Brickner as a "prospect" for a new car, and that Brickner obtained permission to use his second-hand blue Oldsmobile car.

Klaus testified he heard yelling in the alley, ran out and saw two men running toward Grand avenue, and saw them get into the standing car, and saw the car drive off; Klaus hollered and made all the noise he could, as he ran, and called to some one to get the number. As he ran past the garage, he saw Guise with his hair unkempt and blood on his face, "pretty badly beaten up," standing looking after these two men and hollering.

Witness Allen, a milk wagon driver, testified that he saw a car parked opposite a vacant lot on Grand avenue, at the point fixed by Bryson, at about 7:30 a. m. October 21, with two men in the front seat. Other witnesses saw the same car at the same place.

Witness Hoover, a butcher, identified Brickner as the driver and the car as a blue Oldsmobile. Some saw men running from the direction of the Guise garage toward the standing car, with others, including Klaus, in pursuit. Mrs. Johnson, living on Grand avenue, saw the car standing on Grand; heard muffled cries of distress; saw a man running from the direction of the Guise garage, across her lot, headed ffor the standing car, and saw the car almost immediately start. Klaus was following him screaming. Two witnesses, two of the three men picked up by Brickner, at University and Cromwell avenues, testified that that occurred at about 7:50 a. m. of the twenty-first and identified defendant as the man with Brickner.

The clerk at the Seymour hotel testified that room 314, the room Bryson said he occupied on the night of October 20 and 21, was defendant's room. Witness Chambers, employed by defendant, testified that, on the morning of October 20, defendant asked him to go to the Studebaker Sales Company and ask for Brickner, and get some blackjacks from under the back seat of the car they had used the night before, and that he went and found the blackjacks in a car pointed out to him by Brickner, and took them to the office. He also testified that on the morning of the twenty-first at a little before 8 o'clock defendant called him to come to his apartment on Iglehart street, stating that he "had a puncture" and that witness drove defendant down town.

Mrs. Bryson testified that after her husband's arrest in Chicago she came to St. Paul and met defendant with the detective Carling; that defendant told her they did not want Bryson brought to St. Paul and he gave her the names of attorneys to see in Chicago. She saw them and they represented Bryson. She came again to St. Paul and saw Carling and defendant; that, in Carling's absence, defendant said to her: "Tell Bryson to stand pat, not to recognize me at all and take the blame, and if I am out I can help him, but if I am in jail I can't help him, but * * * if they bring him back I will appeal the case and appeal it but, if he has to do any time, it will probably only be a year, and I can get him pardoned by the Governor in about eleven months, and, every month

he is in jail or in Stillwater, I will pay you two hundred a month."

None of these facts are controverted. The defense offered no evidence. The corroboration is quite sufficient. In fact, with no defensive testimony offered, it is hard to see how the jury could acquit.

2. The state challenged four jurors for implied bias. One, Jarvis, was a member of the Citizens Alliance, and the other three were in the employ of business concerns that were members of the Citizens Alliance. It did not appear then, but it did appear later in the case, that defendant was in the employ of that organization. Just what the nature of his employment was does not appear. The court sustained the challenges. In doing so, in one case, he said this: "It appears there is some connection between the Citizens Alliance, whatever it may be I don't know, but in order that there may be nothing of that kind appearing in this case, and in order that we may have a jury without any bias of any kind I will overrule the objection and sustain the challenges."

As to the juror Jarvis, who was a member of the Citizens Alliance, the challenge was properly sustained. The Citizens Alliance is apparently an association of business men and business concerns, and, since defendant was in the employ of the Citizens Alliance, he was in a sense the employe of its members, and the relation of master and servant between a juror and a party is good ground for challenge of the juror for implied bias. G. S. 1913, § 9233, subd. 2.

As to the three who were employes of members of the Citizens Alliance, we think the challenge was not well taken. Yet the ruling was not made arbitrarily, but in good faith, and there is no intimation that the jury that tried the case was not in all respects a fair jury. Under these circumstances it is well settled in this state that the error was without prejudice.

In State v. Kluseman, 53 Minn. 541, 55 N. W. 741, the trial court improperly sustained a challenge, by the state, of a juror for implied bias. On appeal, this was held no ground for setting aside the verdict. The syllabus reads:

"Where the court, on the challenge of the state, improperly rejects a juror, it will not prejudice the defendant if he was tried by an impartial jury," and Gilfillan, C. J., in the opinion said:

"Whether the facts * * * made a case of implied bias, within the statute, or not, his rejection could not, so far as the record shows, have prejudiced the defendants. They had no right to any particular juror being selected, provided they had an impartial jury to try their case, and, nothing appearing to the contrary, it is to be presumed that the jury was impartial."

This decision was followed and approved in State v. Smith, 56 Minn. 78, 83, 57 N. W. 325, and Perry v. Minneapolis St. Ry. Co. 69 Minn. 165, 72 N. W. 55. Unless we overrule these decisions, defendant's contention in this case cannot be sustained. These decisions seem to us sound. They are also in accordance with the weight of authority. The matter is summarized in Thompson, Trials, § 120, as follows:

"As already pointed out, the right to reject is not a right to select. No party can acquire a vested right to have a particular member of the panel sit upon the trial of his cause until he has been accepted and sworn. It is enough that it appear that his cause has been tried by an impartial jury. It is no ground of exception that, against his objection, a juror was rejected by the court upon insufficient grounds, unless, through rejecting qualified persons, the necessity of accepting others not qualified has been purposely created. Thus, in the process of impaneling, no party is entitled, as of right, to have the first juror sit who has the statutory qualifications; though there are authorities to the contrary, chiefly based on exaggerated views of the rights of the accused in criminal trials. But this is on principle quite untenable; since, if the prisoner has been tried by an impartial jury, it would be nonsense to grant a new trial or a venire de novo upon this ground, in order that he might be again tried by another impartial jury."

See also United States v. Marchant & Colson, 12 Wheat. 480, 6 L. ed. 700; Spies v. Illinois, 123 U. S. 131, 8 Sup. Ct. 22, 31 L. ed. 80; State v. Ching Ling, 16 Ore. 419, 421, 18 Pac. 844; State v. La Croix, 8 S. D. 369, 66 N. W. 944; People v. Jose Maria Arceo, 32 Cal. 40, 47; John D. C. v. State, 16 Fla. 554, 561; Commonwealth v. Mosier,

135 Pa. St. 221, 235, 19 Atl. 943; Blankenship v. State, 10 Okla. Cr. 551, 139 Pac. 840, L. R. A. 1916 A, 812.

We adhere to the rule of our former decisions.

3. Defendant contends that the indictment was not sufficient. Section 8631, G. S. 1913, defines assault in the first degree as follows:

"Every person who with intent to kill a human being or to commit a felony upon the person or property of the one assaulted or of another—

1. Shall assault another with a loaded firearm or any other deadly weapon, or by any force or means likely to produce death.

2. Shall administer or cause to be administered to, or taken by, another, poison or any other destructive or noxious thing, so as to endanger the life of such other person, shall be guilty of assault in the first degree   *   *   *."

Section 8632 provides that

"Every person who, under circumstances not amounting to assault in the first degree—

4. Shall wilfully and wrongfully assault another with a weapon or other instrument or thing likely to produce grievous bodily harm—

Shall be guilty of an assault in the second degree."

The indictment charges defendant with "the crime of assault in the second degree committed as follows:" It then charges that defendant did "make an assault in and upon the person of one John M. Guise with an instrument likely to produce grievous bodily harm, to-wit: a blackjack, or some other instrument likely to produce grievous bodily harm." Then follows the charge that defendant did inflict grievous bodily harm and did, with said instrument, cut, beat and wound said Guise about the head and face.

The contention is that it was necessary in the indictment to allege that the assault was committed "under circumstances not amounting to assault in the first degree." The argument is that this case comes within the rule stated in State v. Kunz, 90 Minn. 526, 97 N. W. 131, State v. Minor, 137 Minn. 254, 163 N. W. 514, and many

other cases, that where an exception is part of the enacting clause of a statute and is descriptive of the offense it must be negatived in the indictment. Assuming that this exception is part of the enacting clause, this rule clearly has no application here. When the language of the charge, in the indictment, by necessary inference, negatives the exception, it is not necessary to do so in express terms. Such is the situation here. The acts charged in the indictment could not constitute assault in the first degree as that crime is defined in the statute. Larned v. Commonwealth, 12 Metc. (Mass.) 240 ;Commonwealth v. Hamilton, 15 Gray (Mass.) 480.

4. The court was asked to submit to the jury the question whether either Brickner or Bryson were accomplices, and to charge that, if they so found, they could not find defendant guilty on his uncorroborated testimony. This was allowed as to Bryson only. This instruction stated the law properly, but the whole instruction might have been omitted, because the law as to the necessity of corroboration of accomplices, and as to who are accomplices, was fully covered by the general charge. It would have added little to mention either Bryson or Brickner by name. The mention of Bryson's name and the omission of Brickner's could hardly be a circumstance materially prejudicial to defendant.

5. Defendant contends that in no event could he be convicted of any offense greater than that of assault in the third degree, because there is no testimony of any conspiracy or of any procurement by defendant to commit as grave an assault as assault in the second degree. We think it clear, however, that if defendant is guilty at all he is guilty of the crime that was actually committed. If one procures or conspires with another to commit a crime, he is guilty of everything done by his confederates, which follows incidentally in the execution of the common design, as one of its probable and natural consequences, even though it was not intended as a part of the original plan. 12 Corpus Juris, 557, 578; Boyd v. United States, 142 U. S. 450, 12 Sup. Ct. 292, 35 L. ed. 1077; U. S. v. Sweeney, 95 Fed. 434; Spies v. People, 122 Ill. 1, 12 N. E. 865, 17 N. E. 898, 3 Am. St. 320; People v. Lawrence, 143 Cal. 148, 76 Pac. 893, 68 L. R. A. 193.

6. Bryson testified, that defendant, in their early negotiation told him and Lombard and Collins that he had four or five men he wanted to get, and after they got Klaus they would be taken to some suburban town to stop, and then, as he located the other parties, they would "come in and get him," and every time they got one, "go back * * * come in and go back," being paid all the time. As above stated, Bryson testified to the plan formed, while waiting in the automobile for Klaus to appear, of "getting" Klaus as he went into his garage to get his machine. Bryson then testified that when he met Lombard and Collins in Minneapolis a little later one of them said: "We got the guy," and when defendant arrived about noon he told them they would have to get out of town, that they had got the wrong party. Bryson also testified, over objection, that when he met Collins in Chicago the following week, he said: "We saw this party in the garage, and we got out of the machine and went in the garage, and Lombard hit him and knocked him down, and I hit him a couple of times with a blackjack, and he got up and hollered and we run and got in the machine and drove away."

It is urged that the reception of this testimony was error. The testimony as to what occurred in Minneapolis was clearly a declaration of coconspirators during the carrying out of the conspiracy and pertaining to it, and was admissible as to all of the conspirators. The evidence as to what was said in Chicago was more doubtful. In view of the plan to "come in and go back" for a series of assaults it was probably admissible on the same theory as the testimony as to what was said in Minneapolis. See State v. Thaden, 43 Minn. 253, 45 N. W. 447. But, however that may be, the declaration in Chicago added little or nothing to the undisputed testimony in the case, and its admission, if erroneous, could not justify setting aside the verdict.

7. There is a vague claim made in defendant's brief that the court improperly refused to permit defendant to show the interest of witnesses in the printers' strike. An inquiry along this line was collateral to the real issue, and extended inquiry would tend to confuse and divert the jury from the real issue. Inquiry as to such collateral matters may be permitted to some extent, in the discretion

of the trial court, to show interest of witnesses and sometimes to explain their testimony. We think the court permitted as extended inquiry as was desirable.

8. There are many other assignments of error. None of them present any reversible error. Klaus' testimony that he had been warned of a proposed assault upon him might have been omitted, but it was not important. The refusal to permit defendant's counsel to ask Bryson if Mrs. Klaus was on his bond, was not important. It was a collateral fact which would only bear on the interest of Klaus in the prosecution. His intense interest was very apparent. For some reason, the county attorney objected to counsel for defendant calling attention of the jury to the fact that the chief of police sat behind the county attorney, and the court sustained the objection. Zeal of a chief of police in a criminal prosecution is not reprehensible. The comment was of very minor importance and the restraint of it could not have material effect, one way or the other. The purpose of the comment, in connection with other language used, was apparently to show that the chief of police was partisan, and was exhibiting zeal in the prosecution of offenders on only one side of the strike. But that could not be very important in this case.

9. Exception is taken to some remarks of the county attorney. Charges across the table of "pettifogging" statements to a witness that "they don't want you to tell everything that was said, they don't like that," after the court has ruled out the evidence sought to be elicited, are always improper, and should be promptly rebuked by the trial court, as they were in this case. When made before a discriminating jury, they, as a rule, prejudice the cause only of the one making use of them. In view of the nature of the charges, and the admonishment of the trial court, we think there was no such prejudice as to warrant a new trial.

Judgment affirmed.