## STATE v. BUDE PAVLOVICH AND ANOTHER.[1]

June 10, 1955.

No. 36,461.

*Jack Fena* and *Alfred J. Weinberg,* for appellants.

[1]Reported in 71 N. W. (2d) 173.

*Miles Lord,* Attorney General, *Thomas J. Naylor,* County Attorney, *John T. Naughtin,* Assistant County Attorney, for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying defendants' motion for judgment notwithstanding the verdict or a new trial.

On November 30, 1953, Bude Pavlovich and Mary Anderson, father and daughter, were charged in an information with unlawfully selling liquor, to wit, strong beer containing more than 3.2 percent of alcohol, to a minor named Russell Nylander. A plea of not guilty was entered by defendants, and trial was had on November 30, 1953. The jury returned a verdict of guilty.

Defendants' first assignment of error is that the verdict was not justified by the evidence and was contrary to law. In regard to this, an examination of the record reveals that Russell Nylander testified that he was 19 years of age; that he worked at the Atkins mine at Kinney; and that he lived in Chisholm, Minnesota. He further stated that on the day of the purported illegal sale he reached Chisholm at about five o'clock in the afternoon and that he had given a fellow worker named Hughes a ride home; that upon reaching Chisholm he parked across the street from the J & H Cafe, over which place he had a room; that upon getting out of his car he met a soldier named Kimball; and that he and the latter went into the Ligon Hotel. He claims that he was in the hotel for about half an hour and that while in there he drank two bottles of strong beer. He further testified that at that time he met a friend named Larry Nosie; that Nosie had his brother's car with him; and that after leaving the hotel he and Nosie each drove separate cars back to the Wade mine at Kinney for the purpose of returning the car of Nosie's brother. When this was done, Nosie rode in Nylander's car, and, according to the witness, they went to defendants' place of business in Kinney, where Nylander claims they were from 6 to 6:45 that evening. He testified that while there Bude Pavlovich served him two bottles of strong beer and Mary Anderson served him one or two bottles of the same kind of beer. He said that, after leaving defendants' place, he went back to Chisholm with Nosie and changed

his clothes. He said that he and Nosie then picked up another boy by the name of Bernard Pierce and the three of them went to Hibbing between 7 and 7:30 that evening, where they were involved in an accident. Nosie could not be found to testify at the time of the trial.

Mary Anderson testified that she arrived at her place of business at about six o'clock on the evening in question and that her father, Bude Pavlovich, was not at the tavern when she arrived. She further testified that Nylander and Nosie were not in the tavern on the evening in question nor had they been served any beer in her place of business.

It was stipulated between counsel for defendants and the prosecuting attorney that, because Bude Pavlovich was suffering from a heart ailment, it would not be proper to call him as a witness but that if he were called he would corroborate Mary Anderson's testimony and that he would also deny that he had sold any intoxicating liquor to Nylander and Nosie.

The testimony of Nylander was contradicted in many other aspects by witnesses for defendants. It is our opinion, after reviewing the record in its entirety, that a fact issue was presented on the question whether liquor had been sold to Nylander by defendants and that the conflicts in the evidence with reference to that fact question were for the jury to determine. However, defendants raise several other assignments of error which we believe are meritorious. These assignments consist of errors at law occurring at the trial; claimed misconduct on the part of the prosecuting attorney; and that the verdict was given under the influence of passion and prejudice.

■ Defendants contend that it was error for the court, over objections, to permit cross-examination of Mary Anderson as to her civil liability and bond. In this connection, we can best explain the situation by quoting from her testimony:

"Q. Of course you are aware of the fact that a lot depends on the outcome of this case?

"A. Yes, sir.

"Q. You have a bond?

"A. Yes, sir.

"Mr. Fena: I object to that.

"Mr. Naughtin: Showing interest.

"Mr. Fena: What?

"Mr. Naughtin: I am showing interest.

"The Court: That is right.

"By Mr. Naughtin:

"Q. You are well aware of the fact that if you are proven to have sold intoxicating liquor to this boy that then the parents of the boys who were killed and the boy that was injured—

"Mr. Fena: I am going to object to that. She is only on trial—

"Mr. Naughtin: I haven't finished my question.

"Mr. Fena: I am objecting to anything of that accident.

"Mr. Naughtin: Please let me finish my question.

"Mr. Fena: I am objecting to any reference to that accident. It has been stipulated in the record.

"The Court: I know. I think he is trying to bring out the interest of the witness. I think that is all he has in mind.

"Mr. Naughtin: That is all I have in mind.

"Mr. Fena: It is over my objection any how.

"The Court: Objection overruled.

"By Mr. Naughtin:

"Q. Now, Mary, of course you are vitally interested in the outcome of this case; not only from the criminal angle but from the civil angle. That is true, isn't it?

"A. Yes, sir.

"Q. So it is very important to you, isn't it?

"A. Yes, sir, it is.

"Q. Important not only from the criminal angle, but from the fact that if you had sold intoxicating liquor to this boy and he went out and drove a car and as a result of that people were killed or injured that that would make a case under the law against you, your father and your place of business and your bond.

"Mr. Fena: I am going to object to that question; incompetent, irrelevant, immaterial. It is improper. It has nothing to do with the issues in this case.

"The Court: Overruled.

"By Mr. Naughtin:

"Q.   Answer the question please.

"A.   Will you please repeat it, Mr. Naughtin.

"(The last question was then read by the reporter.)

"A.   Yes, that is right."

It is defendants' position that the questions by the prosecuting attorney and the ruling of the trial court so connected the civil and criminal actions that the obvious result was to implant the idea in the minds of the members of the jury that the unfortunate victims of the accident could be assisted in getting money from defendants and a bonding company. Defendants argue that the circumstances of the accident were such as to arouse the sympathy of the jury, which, coupled with unsupported statements of counsel to the effect that he knew that the jurors had read the newspaper and what they were saying when the accident happened, all tended to divert the attention of the jurors from the specific charge of unlawfully selling liquor to a minor to that of collateral and prejudicial matters.

While the trial court has a large discretion in determining the allowable latitude of cross-examination relating to collateral matters (Drew v. Carroll, 120 Minn. 478, 139 N. W. 953), inquiry should not be permitted in such matters where the only effect would be to unconsciously prejudice the minds of the jurors. Gracz v. Anderson, 104 Minn. 476, 116 N. W. 1116. Inquiry as to collateral matters may be permitted to some extent in the discretion of the trial court to show interest and sometimes to explain the testimony of a witness. State v. Hurst, 153 Minn. 525, 193 N. W. 680. However, it is our opinion that the inquiry which the trial court permitted here, over objections, went far beyond the point of merely attempting to show interest and that it connected the civil and criminal actions in such a manner that a jury well might have been led to believe that the victims of the accident could recover a money judgment from defendants or the bonding company. The failure of the trial court to sustain the objections of defendants under the circumstances here constituted prejudicial error.

■ Numerous other objections were raised with reference to the conduct of the prosecuting attorney in connection with the trial and his final argument. For example, in an attempt to show whether or not the boy to whom the liquor was claimed to have been sold could have become intoxicated on six bottles of strong beer, counsel used his own formula whereby he attempted to compute for the jury a result showing that Nylander had consumed 4.32 ounces of pure alcohol, which would be the equivalent of 8.64 ounces of the strongest 100 percent Bourbon whiskey or the equivalent of ten drinks of 86 percent Scotch whiskey. This computation appears to have been based on the drinking of six bottles of six percent beer. However, there is no proof that the beer which Nylander drank or which was alleged to have been sold by defendants actually contained six percent of alcohol. In fact, the state's expert, Dr. Homer R. Irwin, when questioned on cross-examination as to whether he had ever analyzed a bottle of strong beer, said: "No." He was then asked:

"Q. So you don't know if it is four per cent or six per cent?
"A. I am told by the manufacturers it is six per cent.
"Q. That is your opinion?
"A. Yes.
"Q. It could be four?
"A. As far as I know, yes."

In his final argument (and before) the prosecuting attorney, in referring to strong beer, said that it contained at least six percent of alcohol. He then went on to analyze that there were 12 fluid ounces in a bottle and that, if one drank six bottles, he would consume 72 ounces of beer or the 4.32 ounces of alcohol referred to above. At this point in the argument defendants' attorney interrupted.

"Mr. Fena: Let's stick to the evidence, Mr. Naughtin. We are getting beyond the evidence, Mr. Naughtin. I think you should keep right to the evidence in your final argument.

"Mr. Naughtin: Jack, you haven't learned your lesson yet. I won't contradict you no matter what you say in your argument.

"Mr. Fena: You get beyond the realm of the evidence, if the Court please.

"The Court: I think not.

"Mr. Fena: All right. It is over my objection, let the record show."

After that discussion counsel proceeded to describe his formula to the jury. It is our opinion, under the record here, that at that point in the argument the court should have requested counsel to go no further with his demonstration and explanation of his formula and should have instructed the jury to disregard the prosecuting attorney's previous remarks in that respect.

■ Defendants also object to the general attitude of the prosecuting attorney in connection with other instances incidental to the trial and the closing argument. As a further example of one of these incidents during the trial, defendants call our attention to the so-called silent cross-examination given Maribelle Suttell, a witness for defendants. At the completion of the direct testimony of this witness, the prosecuting attorney, according to the record, arose and looked at the witness for some time but asked her no questions. The witness then said:

"* * * I wish you wouldn't do that, Mr. Naughtin. You make me so nervous.

"Mr. Naughtin: No questions."

Defendants refer to other examples wherein they claim that a technique of sneering at defendants' witnesses or attempting to discredit them was employed by the prosecutor. While we cannot clearly visualize by looking at a cold printed record just what techniques the prosecuting attorney may have used, this court has disapproved of attempts to discredit a defendant by so-called sneers or innuendo. State v. Clark, 114 Minn. 342, 131 N. W. 369. By such disapproval, however, this court does not discourage a vigorous prosecution of a case but only such suggestions and innuendo as would put before a jury matters which would be wrongfully prejudicial to a defendant. State v. Friend, 151 Minn. 138, 186 N. W. 241. We realize that a prosecuting attorney must have considerable leeway in connection with a vigorous presentation of his case. Such

leeway, however, should never go beyond the limits of a fair presentation of the facts in order to permit the performance of justice.

We can well understand, under the record here, with a background of serious and fatal consequences arising out of an accident, where the able prosecutor, with a long record of representing the state in criminal matters, may have let his zeal get somewhat out of bounds during the heat of trial in order to obtain what he considered just results. However, under such circumstances, the presiding judge, acting impartially, with only one purpose in mind—that justice be done—must be ever watchful to see that such matters are controlled. Without further reviewing other objections raised by defendants, it is our opinion that a new trial must be granted defendants.

Reversed and new trial granted.

[1]Reported in 71 N. W. (2d) 153.